UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                          )
                                                )
Deborah Dee Stone                               )        Case No.  24-12767 MER
                                                )
            Debtor                              )        Chapter    13
                                                )
_____        )
                                                )
Deborah Dee Stone,                              )        Adv. Proc. No. 24-_____
                                                )
            Plaintiff,                          )        Objection to Proof of Claim No. 16
                                                )
v.                                              )
                                                )
Real Estate Equity Exchange, Inc.,              )
Unison Agreement Corp.,                         )
Odin New Horizon Real Estate Fund LP,           )
and Unison Investment Management, LLC,          )
                                                )
            Defendants.                         )
                                                )

---

## ADVERSARY PROCEEDING COMPLAINT & OBJECTION TO PROOF OF CLAIM NO. 16

---

### INTRODUCTION

1.  Debtor Deborah Dee Stone ("Ms. Stone") files this joint Adversary Proceeding and Objection to Proof of Claim Number 16 to seek an adjudication of the status of the lien and debt created by virtue of various contracts (collectively, the "HomeOwner Agreement") asserted by Defendants/Creditors Odin New Horizon Real Estate Fund LP and related entities named as defendants herein.

2.  The HomeOwner Agreement at issue purports to be an option contract to purchase an interest in Ms. Stone's home, but it is not a true option. Instead, it is an advance of funds to be repaid at a later date, with substantial interest, secured by a home, otherwise known as a mortgage loan.

3.  Defendants/Creditors misrepresented the nature of the HomeOwner Agreement, marketing and selling it as an "equity sharing" arrangement, when in fact it ultimately—

1

unbeknownst to Ms. Stone—entitled Defendants to a majority of the value of Ms. Stone's home.

4. The transaction was lopsided and deceptive and part of a larger scheme by Defendants to transfer wealth from homeowners to themselves and investors.

5. The HomeOwner Agreement implicates the administration of Ms. Stone's bankruptcy estate as it ties up her most valuable asset, her real estate, which she seeks to liquidate as part of her Chapter 13 Plan.

6. In this Adversary Proceeding Ms. Stone requests that the Court find that the HomeOwner Agreement is invalid and unenforceable because it: (1) is unconscionable and/or induced by unconscionable conduct in violation of common law and statute; (2) is unfair and deceptive in violation of the Colorado Consumer Protection Act; (3) violates Colorado mortgage lending statutes; (4) is usurious and otherwise violates the Uniform Consumer Credit Code and/or reverse mortgage lending requirements; and/or (5) was fraudulently notarized.

7. If the Court finds that the HomeOwner Agreement does not constitute a loan, Ms. Stone requests a declaration that it is void and unenforceable because it is unconscionable. In the alternative, Ms. Stone requests a declaration that it is an executory contract, which she rejects.

## CORE PROCEEDING AND VENUE

8. This Court has jurisdiction over this action under 28 U.S.C. § 1334. The matters complained about are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. § 1409(a).

9. This action is a core proceeding as determination of the issues presented below directly affects the distribution of claims and the status of whether a debt is owed to Defendants, and if a debt is owed, whether this debt is secured or unsecured.

## PARTIES

10. Plaintiff Deborah Dee Stone is a 67 year-old woman, living alone in her home at 202 Lucca Drive, Evans, Weld County, Colorado. Ms. Stone is an unsophisticated consumer with a high school diploma who worked as an administrative assistant during her career before leaving the workforce due to disability. She does not have knowledge of complex secured financial transactions.

11. Defendant Unison Agreement Corp. ("UAC"):

    a. is a Delaware corporation with a principal place of business at 650 California St., Fl. 1800, San Francisco, CA 94108.

2

    b.    is not registered as a supervised lender in Colorado as that term is classified in the Colorado Uniform Consumer Credit Code, C.R.S. § 5-1-301(46).

    c.    originated the transaction at issue.

12.    Defendant Unison Investment Management, LLC ("UIM"):

    a.    is a Delaware corporation and SEC-registered investment advisor with a principal place of business, 650 California Street, Fl. 1800, San Francisco, CA 94108.

    b.    uses the name Odin Investment Management.

    c.    manages and markets to investors assets originating from UAC, including by creating securitized trusts to reduce investment risk, such as the fund at issue in this case, Odin New Horizon Real Estate Fund LP.

    d.    has engaged with Ms. Stone regarding the transaction at issue, after it was securitized.

    e.    is not registered with the Colorado Secretary of State or otherwise licensed in Colorado.

13.    Defendant Odin New Horizon Real Estate Fund LP ("Odin Fund"):

    a.    is a Delaware limited partnership "real estate opportunistic fund" with the same principal place of business, 650 California St., Fl. 1800, San Francisco, CA 94108.

    b.    is managed by Odin New Horizon Partner LLC, which is controlled by UIM.

    c.    was assigned Ms. Stone's loan during the process of the loan's origination.

    d.    is not registered with the Colorado Secretary of State or otherwise licensed in Colorado.

14.    Defendant Real Estate Equity Exchange, Inc.:

    a.    is a Delaware corporation with a principal place of business at 650 California St., Fl. 1800, San Francisco, CA 94108.

    b.    is the corporate parent of UAC and substantially controls UIM and shares the same principal place of business as these companies.

15.    Together, Defendants are joined in common enterprise and are referred to collectively herein as "Unison."

16. Unison operates in thirty states and Washington D.C., including over 200 metro areas. According to Unison, these real estate markets represent more than 82% of the value of all U.S. real estate. Unison currently holds $8.1 billion in real estate "assets."

## FACTUAL ALLEGATIONS

### A. Unison's Business Model

*Unison's Business Model is Investor Driven.*

17. Unison was founded in 2004 by Thomas Sponholtz ("Sponholtz") to provide long term capital assets to investors using residential real estate equity. Sponholtz is currently the Chief Executive Officer of UIM and UAC.

18. Unison is an "institutional investment management firm,"[1] with sophisticated "model, systems, and processes [it] build[s] to make investments,"[2] including "a 10-year forecast on every house in America."[3]

19. Prior to starting Unison, Sponholtz worked at Bear Stearns and then at Barclays Global Investors (now named BlackRock). At Barclays, he got the "big idea" for Unison's business model, when he was "looking around for large asset classes [he] could add to [Barclays] client's portfolio."[4]

20. Sponholtz identified owner-occupied homes as a significant investment opportunity for institutional investors. He noted that these investors had very little "exposure to the asset class" of residential real estate, despite it being the "largest asset class both globally and in the US," making up about 40% of the consumer price index and 16% of the gross domestic product.[5]

21. Sponholtz understood that the typical way for investors to profit off of residential real estate is to purchase homes and rent or resell them. However, this method is inefficient for investors because it requires "tremendous administrative cost in maintaining and being a property manager of [] homes."[6] Sponholtz built the Unison model to provide investors the benefits of increased equity realized from property ownership, without the costs or burdens of actually purchasing or owning the homes themselves.

---

[1] Podcast Transcription Session No. 103 – Thomas Sponholtz & Jim Riccitelli, https://www.fintechnexus.com/wp-content/uploads/2022/09/Podcast-103-Unison-Founders.pdf (last visited June 13, 2024).

[2] Unison IM, https://www.unisonim.com/ (last visited June 7, 2024).

[3] Podcast Transcription Session No. 103 – Thomas Sponholtz & Jim Riccitelli, https://www.fintechnexus.com/wp-content/uploads/2022/09/Podcast-103-Unison-Founders.pdf (last visited June 13, 2024).

[4] *Id.*

[5] *Id.*

[6] *Id.*

4

22.    Unison's business model requires homeowners to bear all the costs and burdens of home purchase and ownership, including property taxes, insurance, maintenance, and management, while the investors treat the home as a passive investment ("long term patient capital"), from which they can expect to realize a tremendous gain.

23.    Unison uses a "very sophisticated data infrastructure and pricing structure" to "turn[] a house into a security" in order to "build[] nationwide portfolios for the benefit of the institutional investor." [7]

24.    In its marketing to investors, Unison explains that its products have "unlimited upside and limited downside" as well as "low volatility and high risk-adjusted net returns compared to other major asset classes,"[8] including traditional home secured loans.

***Unison Structures the Deal to Guarantee a High Rate of Return to Investors at Homeowners' Expense.***

25.    Home equity is the single largest asset for many lower- and middle-income families. It is essential for wealth building and for maintaining financial security.

26.    To access this "asset class," Unison developed a consumer-facing contractual arrangement it calls the "HomeOwner Agreement."

27.    Under the Unison HomeOwner Agreement, Unison provides a cash payment to homeowners in exchange for a purported "option to purchase" a substantial percentage (in this case, 70%) of the home at the inception of a qualifying event, such as expiration of the agreement's thirty-year term, the homeowner's death, or the sale of the home.

28.    Unison has structured its business model to hedge against any losses and shift the cost and risk of transactions onto homeowners, including through a requirement to pay back the original payment at a substantial increased cost—that is, interest—through the sale of the home, as well as bear any associated additional costs. The Unison HomeOwner model ensures a high rate of return to Unison and its investors for several reasons.

29.    Homeowners are much more likely to sell their homes when their homes have accrued equity, rather than at a loss. In other words, the vast majority of home sales will occur when Defendants realize a meaningful gain.

30.    Unison's contracts have a 30-year term, and the typical duration is ten years. According to Unison's prior President and co-CEO, this is a "longer term holding period," over which "real estate tends to perform fairly consistently."[9]

---

[7] *Id.*

[8] Unisom IM, https://www.unisonim.com/about-us (last visited June 7, 2024).

[9] *Id.*

31.     A home will likely appreciate over a thirty-year period because, as Unison reports, "home equity tends to increase with the years of homeownership."[10]

32.     Unison protects itself and investors from any market volatility in short-term sales by refusing to "share in any of the losses when a homeowner does not stay in their home" for several years after entering the transaction.[11]

33.     Homeowners are responsible for paying all "closing costs" associated with the transaction, including appraisal and settlement costs (such as title, state taxes, and recording fees). On its website, Unison estimates these closing costs range from $1,800 to $4,050, depending on the location of the home. Unison's estimates are likely to be significantly understated in certain markets and depending on home value.

34.     Unison further guarantees that it gains at the expense of homeowners by discounting the original appraised value of the home to reach a falsely lower "Original Agreed Value," so that when it later calculates its percentage share of the increased value of the home, Unison's share is more profitable.[12]

35.     Unison also requires that homeowners maintain the property and pay for all fees, property taxes, and insurance for the property to ensure against risk.

36.     Unison places a lien on the home to protect its interest, and then pools the "asset" into a securitized trust, which it sells to institutional investors such as pension funds.

37.     If a homeowner defaults on their obligations under the HomeOwner Agreement, Unison can seek a variety of financial remedies from the homeowner to ensure that it does not incur a loss, including through advances that accrue interest at a usurious rate, liquidated damages, and acceleration of the contract and foreclosure.

38.     As the result of these and other provisions that protect investors at the expense of homeowners, Unison's portfolio has "achiev[ed] a 20.7% annualized net return since 2012,"[13] more than two-fold the stock market's average annualized net return.

39.     In recent years, Unison has securitized nearly a billion dollars in Unison Homeowner Agreements.

---

[10] 2022 Unison Home Equity Report, https://www.unison.com/blog/home-equity-report-2022/ (last visited June 13, 2024).

[11] FAQ - Home Equity Sharing Agreements, https://www.unison.com/faq/ (last visited June 13, 2024). Unison currently has a five year prepayment penalty for early sale of the home and will never share in the losses if a homeowner attempts a buy out of the agreement without selling her home. Ms. Stone's agreement has a three year penalty.

[12] Unison currently assesses a 5% Risk Adjustment. *Id.*

[13] Unison IM, https://www.unisonim.com/ (last visited June 7, 2024).

**Unison Misrepresents Its Financial Product to Homeowners.**

40.     Unison advertises the Unison HomeOwner Agreement as an "equity sharing agreement." Unison tells homeowners that using its product is a "smarter way to access the equity you already own," and will lead to "no extra debt, no interest, no monthly payments."[14]

41.     Unison purports to invite homeowners to "make a partial sale of [the] equity they own in their home" in exchange for a "lump sum of cash."[15]

42.     But the Unison HomeOwner Agreement does not operate as Unison advertises. Unison takes a majority  interest in the entire home, not just the home's equity, which comprises the value of the home that exceeds any home-secured debt. The agreement is therefore a homeownership sharing agreement (although the original homeowner carries all of the costs of homeownership), not an "equity sharing agreement."

43.     This difference is material, because if Unison were sharing only in the available equity in homes, as it advertises, the HomeOwner Agreements would be substantially more likely to result in a loss or lower profits to Unison and its investors.

44.     For example, in Ms. Stone's case, Unison's Proof of Claim sets forth that it would be paid $88,352.60 if the home were sold now, based on the actual terms of the agreement, which award Unison 70% of the value of Ms. Stone's entire home. (Claim No. 12.) If, however, the calculations set forth by Unison on page 4 of its Proof of Claim were made based on Ms. Stone's home *equity*, after deducting for Ms. Stone's first mortgage, Unison would *owe* Ms. Stone $1,512.88.[16] (*See* Claim #12 at 4; Claim #7.)

45.     Unison misrepresents that it will only take a percentage of home equity rather than a large percentage of the home's total value in order to deceive homeowners about the true risks and costs of the transaction.

46.     Unison markets itself as being in "a partnership"[17] with homeowners, telling them that, "this investment has been made available to everyday people like you and me," and that "we share in the upside and the down."[18]

---

[14] *Id.*

[15] Podcast Transcription Session No. 103 – Thomas Sponholtz & Jim Riccitelli, https://www.fintechnexus.com/wp-content/uploads/2022/09/Podcast-103-Unison-Founders.pdf (last visited June 13, 2024).

[16] This calculation assumes that Unison exercises its option and does not account for Ms. Stone's Home Equity Line of Credit described in Claim #4. If Claim #4 were taken into account, Unison would owe Ms. Stone even more funds, using the home equity figure. If Unison did not exercise its option, it would lose the original investment payment. In contrast, using the Unison contract, Unison recoups its original payment and makes substantial profit.

[17] *Id.*

[18] Unison Equity Sharing - No Monthly Payments, No Added Debt, https://www.unison.com/ (last visited June 7, 2024).

47. However, an essential element of partnership is the sharing of the business losses or expenses.[19] Unison, however, has structured this transaction so the homeowner bears all the expenses, and Unison is highly unlikely to share any losses.

48. Partners also owe each other a fiduciary duty.[20] However, as a SEC-registered investment advisor, UIM is legally required to act in the best interest of its clients—its investors—not in partnership with homeowners.

49. In fact, in the fine print of the actual contracts, Unison admits that its marketing is false by stating that it is not, in fact, the homeowner's partner.

50. In written materials provided to homeowners, Unison gives them the impression there is an equal chance of their home value increasing and decreasing over the term of the loan, such that Unison shares in the risk of loss or gain.

51. However, Unison promises investors that it has ensured, including through its modeling and home value forecasts, and manipulation of appraisal values, that the homes that it engages with are nearly guaranteed to increase in value over the course of the contract, such that the result of the contract is that Unison will gain money and the homeowner will lose money.

### *The Unison HomeOwner Agreement Operates Like a Mortgage Loan, Not an Option Contract.*

52. Despite Unison's claim that the Unison HomeOwner Agreement is an "option to purchase contract," the product operates exactly like a home-secured loan—only with worse terms for borrowers and none of the protections provided by lending laws.

53. Unison has structured the Homeowner Agreement to nearly guarantee that it will get repaid. Indeed, Unison represents to homeowners that it "typically" will repay itself through the sale of the home.

54. Even when a homeowner "chooses to terminate [the] relationship with Unison," the homeowner must pay back at least the initial lump sum of money and Unison's "Investor Percentage," just like they would have to if Unison exercised its option.

55. After the loan is originated and the lien is placed on the property, Unison immediately bundles it with other loans and places it into an asset-based security, exactly in the same manner that lenders securitize home-secured loans to reduce risk. Investors analyze these loan pools using the same analytics as they use for mortgage backed securities.

---

[19] 68 C.J.S. Partnership § 131.

[20] 59A Am. Jur. 2d Partnership § 270 ("One of the paramount duties of partners among themselves, if not the primary duty, is their fiduciary duty, universally recognized as including a duty to exercise good faith and maintain the highest integrity in dealing with other partners."); 68 C.J.S. Partnership § 569 ("General partners owe their limited partners the duty of utmost good faith or honesty and loyalty or obedience, as well as candor, due care, and fair dealing.")

56. Sponholtz himself has described the Unison HomeOwner Agreement as "similar to any home financing transaction."[21]

57. In short, the Unison product is not a true option, but instead is an advance of funds to be repaid at a later date, with substantial interest, secured by a home—otherwise known as a mortgage loan.

58. As a result of Unison's mischaracterization of its product as an option rather than a loan, Unison seeks to circumvent regulatory requirements that protect consumers from predatory lending, including by:

    a. Charging much higher effective rates of interest than are legally permitted for home secured loans;

    b. Failing to provide disclosures that are required for home secured loans so homeowners can understand the long-term risks, costs, and benefits of a transaction; and

    c. Failing to give homeowners a cooling-off period, during which they can read and understand the transaction, and cancel it if necessary.

## B. Ms. Stone's Transaction

59. On October 13, 2016, Ms. Stone purchased her home at 202 Lucca Dr., Evans, CO, for $141,500.

### Unison Solicits Ms. Stone, Hiding the Cost of the Transaction.

60. Around December of 2018, Ms. Stone responded to a Unison advertisement for the Unison HomeOwner program.

61. Ms. Stone, who was living on a fixed disability income, called Unison and inquired about the advertisement.

62. At the time, Ms. Stone's plan was to remain in her home until she died and leave it to her children upon her death. She anticipated that her children would sell the home at that time, and the equity realized from the sale would be part of their inheritance.

63. Ms. Stone understood from talking to Unison that she could take out a loan from them, using her home as collateral.

64. The Unison representatives did not reveal the true cost of the transaction.

---

[21] "Equity Access - Marin Magazine - May 2007 - Marin County, California". www.marinmagazine.com. 10 April 2007, https://marinmagazine.com/community/local-business/equity-access/.

65. Ms. Stone continues to understand the transaction to be a home-secured loan.

66. Based on the representations made by the Unison representatives that she could take out the loan and not pay it back until the house was sold, Ms. Stone decided to move forward with the transaction.

***Unison Emails Confusing and Misleading Documents to Stone for Signature.***

67. On or about December 19, 2018, a Unison representative emailed a nineteen-page series of documents to Ms. Stone.

68. The first page of the document states that it is an "Offer to enter into a Unison HomeOwner Agreement."

69. The document states:

> The **Original Agreed Value** of your Property has been established as $200,000.00.
>
> If you accept our Offer, you will grant Unison Agreement Corp. ("**Unison**") an Option to purchase a percentage interest in your home in the future. The percentage interest in your home will be 70.00% interest (the "**Investor Percentage**"). The price Unison will pay will total $140,000.00 (the "**Unison Purchase Price**"). Unison will pay you a portion of the Unison Purchase Price (the "**Unison Investment Payment**") upon closing of your Unison HomeOwner Agreement, less a transaction fee. Here is a calculation of the amount of the Unison Investment Payment to you:
>
> | | |
> |---|---|
> | Unison Investment Payment | $35,000.00 |
> | Less Unison Transaction Fee | $1,365.00 |
> | Equals Gross Proceeds | $33,635.00 |
>
> Unison will pay the balance of the Unison Purchase Price to you ("**Unison Purchase Price Balance**") when your Unison HomeOwner Agreement ends, which typically is when you sell your home.

70. According to information hidden in the fine print on Unison's website, upon information and belief, the "Original Agreed Value" was not the true value of Ms. Stone's home; rather, it was a discounted amount that would increase Unison's future profits.

71. The documents contained in this packet include various calculations and legalese and are confusing and hard to understand.

72. The documents are misleading, including that they give the impression that there is an equal chance of Ms. Stone's home value increasing and decreasing over the term of the loan, in contrast to Unison's own internal projections. Unison indicated that it would share in any profit or loss with Ms. Stone; Ms. Stone understood that the market could increase or decrease. This provided her with some comfort about the transaction.

73. Ms. Stone is not privy to Unison's internal business projections.

74. The purported cost estimates also misleadingly fail to include fees and costs incurred by the homeowner in the transaction.

10

75.     Upon information and belief, based on public statements made by Unison, its principals, and UIM, these projected home values do not reflect Unison's internal projections of home value or risk or the projections that it shares with its investors.

76.     Unison did not explain the nature of these documents to her.

77.     The documents repeatedly confirm that this was a loan by including statements making clear that Ms. Stone would be required to pay Unison back.

78.     For example, one document states:

> The term of your Unison HomeOwner Agreement (**"Term"**) is thirty (30) years. If you have not sold your Property or otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by paying Unison an amount equal to the value of its investment interest in the Property at that time. The financial terms discussed in this paragraph are found in **Section 10** of the Unison HomeOwner Option Agreement.

79.     Ms. Stone did not understand that she would have to sell after thirty years, regardless of whether she was still alive at the time. She had believed that she would only have to pay off when she sold or died, at her choice.

80.     The documents repeatedly refer to other documents and incorporate them by reference, but do not include those additional documents for review.

81.     Ms. Stone did not request a payment on her first mortgage as part of the transaction; however, hidden in the documents was a requirement that a payment of $2,192 be made on her first mortgage from the Unison Investment Payment.

82.     Understanding that she would  receive a loan in the amount of $33,635, Ms. Stone electronically signed these documents on December 19, 2018.

***Assignment to Odin Fund.***

83.     On December 19, 2018, the date Ms. Stone e-signed the Offer documents, UAC assigned all rights and interests under four separate contracts—all purportedly dated the same date—to Odin New Horizon Real Estate Fund LP.

84.     Ms. Stone had not seen these documents nor entered into these agreements as of the time of the assignment. The nineteen-page packet of documents she had reviewed contained none of these contracts.

85.     According to the Offer letter, as of the date of assignment, several unfulfilled conditions remained outstanding before the transaction could be completed.

*Unison Instructs Ms. Stone to Sign Additional Documents.*

86.     Unison advised Ms. Stone that someone would come to her home on December 22, 2018, to close the transaction.

87.     On December 22, 2018, a man came to Ms. Stone's home with a stack of papers for her to sign for Unison.

88.     The man placed the stack of documents, comprising nearly 100 pages, in front of Ms. Stone and told her where to sign them.

89.     Ms. Stone asked questions about the documents, but the man told her that he could not answer any of her questions and was just there to get her signature on the documents.

90.     Ms. Stone did not understand the contents of the various documents presented to her for signature on December 22, 2018.

91.     Ms. Stone was not provided a signed or countersigned copy of any of the December 22, 2018, documents.

92.     Ms. Stone signed various documents, including a Deed of Trust and Memorandum of Unison Agreement.

93.     Two of the documents—a Deed of Trust and Memorandum of Unison Agreement—are purportedly notarized by Shirley Dodge.

94.     However, Ms. Stone never met with Shirley Dodge.

95.     Further, Ms. Stone was never asked to provide any identifying documents to a notary or to the man who entered her home.

*Unison Deceptively Records Lien on Home*

96.     On January 3, 2019, Unison recorded the Memorandum of Unison Agreement and Unison Homeowner Deed of Trust with the Weld County Clerk and Recorder.

97.     The Deed of Trust indicates that the consideration is $35,000 and provides no other information about the amount of the lien placed on the property.

*Hidden Impact of the Transaction*

98.     Unison did not provide required lending disclosures to Ms. Stone.

99.     Instead, Unison provided "disclosures" that did not comply with lending laws and were designed to be confusing and misleading.

100. As a result, Unison obscured the finance charges and cost of the credit.

101. At no time did a Unison representative explain the nature of the transaction or the approximately 100 pages of complicated legal documents that it presented Ms. Stone to sign.

102. Ms. Stone did not, and could not, understand the nature of the agreement. Ms. Stone has a high school degree and worked as an administrative assistant during her career and does not have knowledge of complex secured financial transactions. Indeed, the documents would be extremely difficult for anyone to understand.

103. Unbeknownst to Ms. Stone at the time, the agreement includes the following terms:

   a. Unison agreed to provide $35,000 to Ms. Stone minus a transaction fee of $1,365 paid to Unison and $2,192 paid by Unison to Quicken Loans on behalf of Ms. Stone. After deduction of Unison's transaction fee and the payment to Quicken Loans, Ms. Stone was paid $31,443 by Unison.

   b. Despite Unison's advertisement that it would only take a share of Ms. Stone's home equity, Ms. Stone granted a right to Unison to purchase a 70% interest in her entire home.

   c. Unison states that its "purchase price" for this so-called "option" is $140,000. However, Ms. Stone was not paid this amount. Instead, the $35,000 (minus fees) was paid to Ms. Stone as a purported "advance" with the remaining $105,000 to be paid out of the sales price of Ms. Stone's home at the time Unison exercises its so-called "option."

   d. Thus, Ms. Stone would never receive any benefit from the $105,000 that is purportedly part of Unison's purchase price, given that this amount would be part of her home equity realized at the time of sale whether or not she ever entered into an agreement with Unison.

   e. Unison will almost certainly be paid back for the initial loan amount. Unison will have the opportunity to be paid back at the earlier of: the conclusion of the thirty year term; the date of sale of the property; the death of the homeowner; or the homeowner's default. Unison can force a sale upon the homeowner's default, the homeowner's death, or at the end of the thirty-year term to ensure that it is paid back. Given the terms of the agreement, Unison will recoup at least some of the loan even if the home depreciates over 25% in value, a nearly unheard of scenario that did not even occur in Ms. Stone's community during the real estate market crash in 2008.

   f. Despite Defendants' advertisement that no monthly payments or costs are associated with the transaction, Ms. Stone is responsible for all costs associated with the property, including upkeep and maintenance of the property, timely

13

payment of all taxes, maintenance of insurance, timely payment of her mortgages, payment of all other fees and costs during the term of the contract, and avoidance of any liens.

g.  This is to protect Unison's interest in the home. If Ms. Stone fails to comply with these obligations to Unison's satisfaction, Unison can force a sale of the home and recover all amounts that it would be due under the contract, plus any damages that it has purportedly suffered, as well as multiple other "remedies."

h.  Ms. Stone would be penalized if she sold her home within three years of entering the agreement. If she did sell within three years, she would be required to pay Unison in full plus the initial transaction fee, and Unison would not share in any losses from decline in property value. This protected Unison and investors from short term market volatility.

i.  When the property is sold, Ms. Stone will be required to pay all real estate commissions, selling costs, and costs of appraisals.

j.  Unison is responsible for no costs associated with maintaining and growing equity in the home but will recover the overwhelming majority of the proceeds of appreciation in home value over the course of the agreement.

104.  By structuring the deal in this way, Unison effectively guarantees that it will be profitable to exercise its option to purchase, so it is therefore not a true option.

### *Ms. Stone Begins to Discover the Impact*

105.  In late-2023, facing a change in her circumstances, Ms. Stone decided that she would sell her home to recover some of her home equity and move in with one of her daughters.

106.  In anticipation of putting her home on the market, Ms. Stone obtained the payoff amounts for her first mortgage and home equity line of credit.

107.  She was unable to obtain a payoff from Unison, so she contacted the company.

108.  At that time, Ms. Stone learned for the first time that she would gain no proceeds from the sale of the home due to the nature of her agreement with Unison.

109.  The Unison representative, a UIM employee, followed up with an email dated October 18, 2023, stating:

It was great speaking to you! I've broken down the math below for your use!

Example:
$270k - $200k = $70k
$70k * 70% = $49k
Total payoff = $49k + $35k = $84k

Formula:
Home Market Value - Original Agreed Value ($200k) = (Appreciated Difference)
(Appreciated Difference) * Investor Percentage (70%) = Unison's share in equity
Unison's share in equity + Original Investment Price = Payoff

110.   This was the first time Ms. Stone began to understand the ultimate cost of the transaction.
       Ms. Stone, however, remains confused about these calculations.

111.   If Ms. Stone had understood the cost of the transaction at the time that she entered the
       transaction, she never would have agreed to it.

112.   Not accounting for the missing payment to Quicken, based on the advance payment of
       $33,635 that Mr. Stone received, a payoff of $84,000 would be an effective annual
       percentage rate (APR) of 20.7749% for the loan.

113.   Using these figures, after paying off Unison, Ms. Stone would have been left with
       insufficient funds to pay off her legitimate mortgage loans.

114.   Notably, Unison referred to the amount as a payoff and did not refer to an "option" in
       these communications.

115.   Unison further assumes in its formula, consistent with its statements to investors, that the
       home's value will appreciate.

116.   While this interaction began to inform Ms. Stone of the impact of the transaction, she
       continues to learn more about the terms of the agreement to this day.

117.   As the result of the Unison contract, Ms. Stone is trapped in her home without the ability
       to sell to recoup any of her home equity after paying off the other home secured loans.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
UNCONSCIONABILITY
C.R.S. § 5-5-109 and/or Common Law Contract Defense

118.  Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

119.  As described above and set forth herein, the agreement is substantively and procedurally unconscionable, including but not limited to the following:

a.   Ms. Stone is a high school graduate without a sophisticated understanding of complex financial transactions;

b.   Defendants are large financial companies engaged in the business of soliciting homeowners and placing them in agreements like the one entered by Ms. Stone;

c.   Ms. Stone and Defendants occupied and occupy significantly unequal bargaining positions;

d.   Defendants drafted all documents, amounting to approximately 100 pages and presented them as contracts of adhesion;

e.   Defendants provided no meaningful explanation of the documents to Ms. Stone and instead simply instructed her to sign;

f.   Defendants assigned the documents prior to Ms. Stone even entering the agreement;

g.   Defendants falsely affixed a notary block and signature to the documents even though Ms. Stone did not sign before a notary;

h.   Defendants failed to provide accurate disclosures related to the transaction and cost of credit as required by law;

i.   Defendants instead provided purported disclosures that were misleading, misstated the risks and costs of the transaction, and were confusing;

j.   Upon information and belief, Defendants manipulated the purported "original value" to increase their profits;

k.   Defendants required that Ms. Stone pay a prepayment penalty if she sold her home within three years of the contract, to further insulate them from loss at her cost;

16

l.     Defendants required that Ms. Stone bear all costs in order to  protect and increase their profit, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

m.    The actual cost of the transaction to Ms. Stone was extremely high;

n.    The terms of the transaction are substantially one-sided in favor of Defendants, who drafted the documents and their terms, and guarantee a substantial rate of return to Defendants at very limited cost or risk, while placing an outsized burden of the costs and risks on Ms. Stone, as described above.

120.    The transaction described herein is, gave rise to, or led Ms. Stone to believe would give rise to a consumer credit transaction given that Ms. Stone believed she was entering into a loan.

121.    Because the transaction was unconscionable at the time it was made or induced by unconscionable conduct, Ms. Stone is thus entitled and respectfully requests all available relief including that the court refuse to enforce the agreement and award her reasonable attorney fees. C.R.S. § 5-5-109.

122.    In addition, or in the alternative, Ms. Stone is entitled to and respectfully requests all appropriate relief pursuant to the common law contract defense of unconscionability.

## SECOND CLAIM FOR RELIEF
VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
C.R.S. §§ 6-1-101 *et seq.*

123.    Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

124.    Defendants engaged in unfair and deceptive trade practices as described above, including but not limited to by:

a.    including false and misleading "disclosures" in the materials that underestimated the costs of the transaction to Ms. Stone;

b.    including false and misleading information that underestimated the profits that Defendants would gain from the transaction;

c.    misrepresenting the true nature of the transaction as an "option" rather than a loan;

d.    placing all costs of the transaction onto Ms. Stone while ensuring that they would reap the benefits;

17

e.   structuring the transaction in a manner that would make it impossible for Ms. Stone to weigh or understand the nature of the transaction;

f.   misrepresenting that the product was better than a mortgage loan or reverse mortgage, when in fact it was a reverse mortgage or mortgage loan, but with worse terms;

g.   placing a restraint on the sale of Ms. Stone's home in the first three years of the contract;

h.   failing to maintain appropriate licensure or otherwise comply with lending laws;

i.   advertising and providing misleading representations regarding the rates, terms, and conditions of a mortgage loan; and

j.   otherwise placing Ms. Stone in a highly lopsided and unfair transaction that benefited them while placing all costs and risks on her.

125.   As described above, Defendants engaged in deceptive trade practices including by:

a.   making false representations of the characteristics and benefits of the transaction, in violation of C.R.S. § 6-1-105(1)(e);

b.   disparaging the goods, services, or business of another by false or misleading representation in violation of C.R.S. § 6-1-105(1)(h);

c.   making false or misleading representations of fact concerning the price of its services in violation of C.R.S. § 6-1-105(1)(*l*);

d.   failing to meaningfully or effectively disclose material information about the transaction in order to induce Ms. Stone into the transaction in violation of C.R.S. § 6-1-105(1)(u);

e.   failing to obtain necessary governmental licenses and permits, namely, appropriate residential lending licenses, in violation of C.R.S. § 6-1-105(1)(z);

f.   violating C.R.S. § 38-40-105 in violation of C.R.S. § 6-1-105(1)(uu);

g.   violating C.R.S. § 12-10-713 in violation of C.R.S. § 6-1-105(1)(bbb); and/or

h.   engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practices in violation of C.R.S. § 6-1-105(1)(rrr).

126.   Defendants' actions significantly impact the public, including by:

18

    a.    Defendants' widespread dissemination of deceptive advertising to consumers or potential consumers of Unison's goods or services that is intended to deceive consumers as to the costs and impact of the transaction.

    b.    Defendants' creation of confusing and deceptive liens on properties that negatively impact consumers and obscure the amount of pre-existing liens to other lienholders.

    c.    Defendants' practice of placing restraints on the sale and financing of real property, thereby impacting liquidity in the real estate market.

127.    Plaintiff is thus entitled to appropriate relief pursuant to the Colorado Consumer Protection Act, including a declaration that the contracts are invalid and void, that no amounts are owed, and an award of reasonable attorney fees and costs.

## THIRD CLAIM FOR RELIEF
### VIOLATIONS OF MORTGAGE LENDING REQUIREMENTS
### C.R.S. §§ 38-40-101 *et seq.*

128.    Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

129.    The product Defendants provided to Ms. Stone was a loan, in that Ms. Stone received a payment of money for which she agreed to compensate Defendants; and through which transaction Defendants typically expected full repayment plus additional funds at a later date. *See Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400, CO 2015.

130.    The loan was primarily for personal, family, or household use and secured by a deed of trust on residential real estate used as Ms. Stone's primary residence.

131.    As a result, the transaction is a residential mortgage loan under Colorado law. C.R.S. § 12-10-702(21).

132.    Defendants are mortgage lenders and/or mortgage loan originators under Colorado law. C.R.S. § 12-10-702(13), (14).

133.    As described in detail above, Defendants engaged in prohibited activities including:

    a.    Knowingly advertising, displaying, distributing, or broadcasting false, deceptive, or misleading statements with regard to rates, terms, or conditions for Ms. Stone's mortgage loan, in violation of C.R.S. § 38-40-105(1)(a);

    b.    Making false promises or misrepresentations or concealing essential or material facts from Ms. Stone to entice her to enter into the transaction, in violation of C.R.S. § 38-40-105(1)(b);

    c.    Facilitating the consummation of a mortgage loan agreement that is unconscionable given the terms and circumstances of the transaction, in violation of C.R.S. § 38-40-105(1)(d); and/or

    d.    Knowingly facilitating the consummation of a mortgage loan transaction that violates C.R.S. § 12-10-713, in violation of C.R.S. § 38-40-105(1)(e).

134.    In addition, or in the alternative, as described in detail above, the mortgage loan at issue and/or its terms was unconscionable at the time it was made. C.R.S. § 38-40-105(2).

135.    As the result, Ms. Stone is entitled to and seeks all available remedies, including: (1) a declaration that the transaction is a mortgage loan; (2) a declaration that Defendants do not have the right to enforce the contract and an order enjoining the same, (3) an order requiring Defendants to release of the deed of trust, C.R.S. § 38-40-105(2); and (4) her reasonable attorney fees and costs, C.R.S. §§ 38-40-105(3), 6-1-113(2).

### FOURTH CLAIM FOR RELIEF
VIOLATIONS OF THE COLORADO CONSUMER CREDIT CODE
C.R.S. §§ 5-1-101 *et seq.*

136.    Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

137.    Ms. Stone is a natural person.

138.    Ms. Stone incurred a "debt," that is, "an obligation to repay." *Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400 ¶ 42, CO 2015.

139.    The debt was incurred for a personal, family, or household purpose.

140.    The debt was by written agreement in which a finance charge was made.

141.    The debt was secured by an interest in land.

142.    As a result, the transaction is a consumer loan subject to the Colorado Uniform Consumer Credit Code (UCCC). C.R.S. § 5-1-301(15)(a); *Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400, CO 2015.

143.    The UCCC mandates that a consumer loan other than a supervised loan cannot contain an interest rate higher than 12%. C.R.S. § 5-2-201(1).

144.    A "supervised loan" is a loan in which the interest rate exceeds 12%. C.R.S. § 5-1-301(47).

145.    Supervised loans must be made and held by a licensed supervised lender. C.R.S. § 5-1-301(46).

146.    Defendants are not licensed as supervised lenders.

147.    For all consumer credit transactions, including consumer loans, the UCCC requires certain information, disclosures, and notices to be provided to the consumer, including disclosures regarding the actual cost of the transaction. C.R.S. § 5-3-101.

148.    Defendants did not provide the required information, disclosures, or notices to Ms. Stone.

149.    Defendants did not provide the required balloon disclosures and the contract terms do not otherwise reflect the rights Ms. Stone had under the UCCC.

150.    The loan violates the UCCC, including in the following ways:

   a.    The interest rate exceeds 12%;

   b.    The loan was issued by and is held by entities that are not supervised lenders; and/or

   c.    The loan was issued without provision of the required disclosures, information, and notices.

151.    Because the transaction was issued in violation of the UCCC, Ms. Stone is entitled to and seeks all available remedies under the UCCC, including a declaration that the transaction is a loan, that the contract is invalid and of no force and effect, and that no debt is owed by Ms. Stone; and an order awarding Ms. Stone reasonable attorney fees and costs. C.R.S. §§ 5-5-109, 5-5-201 *et seq.*

### FIFTH CLAIM FOR RELIEF
### (IN THE ALTERNATIVE TO FOURTH CLAIM)
VIOLATIONS OF REVERSE MORTGAGE REQUIREMENTS
C.R.S. §§ 11-38-101 *et seq.*

152.    Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

153.    The transaction included a written instrument evidencing or creating a nonrecourse loan secured by real property.

154.    The transaction provided a lump sum cash advance based on Ms. Stone's owner-occupied principal residence.

155.    The transaction required no partial or other payment of principal or interest until the entire loan becomes due and payable.

21

156.   Defendants regularly make loans or advances secured by interests in residential real property.

157.   As a result, the money provided to Ms. Stone is a reverse mortgage. C.R.S. § 11-38-102; *see also Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400, CO 2015.

158.   The transaction violates C.R.S. § 11-38-103 because it includes a penalty if the home is sold and the mortgage paid within three years of origination.

159.   The transaction violates C.R.S. § 11-38-105 because it includes finance charges that exceed the permissible rates for entities that are not licensed as supervised lenders.

160.   The transaction violates C.R.S. § 11-38-109 because it was issued without appropriate disclosures to the borrower, prior to closing, regarding the projected total loan cost rate for the loan.

161.   The transaction violations C.R.S. § 11-38-111 because it was issued without an appropriate attestation that Ms. Stone was advised by Unison to obtain independent counseling regarding the advisability of Ms. Stone entering into the transaction and that Ms. Stone either received this counseling or waived it in writing.

162.   Because the transaction was issued in violation of the reverse mortgage lending requirements, Ms. Stone is entitled to and seeks all available remedies, including a declaration that the contract is invalid and void, that no debt is owed, and an award of reasonable attorney fees and costs.

### SIXTH CLAIM FOR RELIEF
ACTION FOR DECLARATORY RELIEF - FRAUDULENT NOTARIZATION

163.   Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

164.   Ms. Stone seeks declaratory relief, pursuant to the Uniform Declaratory Judgments Law, C.R.S. 13-51-101 *et. seq.* and C.R.C.P. 57, on the issue of whether the quit claim deed is invalid.

165.   In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status, and relationships of the parties under the above law and facts. Such interpretation is appropriate under the provisions of the Uniform Declaratory Judgments Law, C.R.S. 13-51-101 et. seq. and C.R.C.P. 57.

166.   The Deed of Trust and Memorandum of Unison Homeowner Agreement purport to be notarized.

167.   Ms. Stone did not sign the notarized documents in front of a notary.

168.    Upon information and belief, the Unison representative that came to Ms. Stone's home was not a notary.

169.    Ms. Stone never provided her driver's license to a notary as part of signing the Unison documents.

170.    Ms. Stone never signed a notary book as part of signing the notary documents.

171.    If the notary section on the Unison Deed of Trust and Memorandum of Unison Homeowner Agreement were forged, these documents are void and of no force or effect.

172.    Ms. Stone seeks an order from the court determining that the Deed of Trust and Memorandum of Unison Homeowner Agreement were not properly notarized, are not a validly executed document, and are of no force or effect.

## SEVENTH CLAIM FOR RELIEF
### (ALTERNATIVE TO THIRD, FOURTH, AND FIFTH CLAIMS)
ACTION FOR DECLARATORY RELIEF - REJECTION OF EXECUTORY CONTRACT

173.    Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

174.    Ms. Stone asserts that the contract is void and invalid for the reasons stated above. If the Court finds that the contract is valid and not a loan, Ms. Stone asserts her rights pursuant to the bankruptcy code to reject the executory contract.

175.    Defendants retain obligations under the contract that are not yet performed.

176.    For instance, the offer letter, which Ms. Stone executed on December 19, 2018, states: "Unison **will pay** the balance of the Unison Purchase Price to you ("Unison Purchase Price Balance") when your Unison HomeOwner Agreement ends, which is typically when you sell your home." (emphasis added; original emphasis omitted).

177.    Defendants thus retain the obligation to pay Ms. Stone the Unison Purchase Price Balance of $105,000, at such time as she sells the home or the agreement terminates.

178.    To the extent that the transaction is an option contract and not a loan, Defendants also retain future obligations to determine whether to exercise their option and take relevant steps related to the exercise or termination of their option, including providing Ms. Stone notice of what it decides about exercising its option.

179.    Ms. Stone therefore requests that the Court declare that the contracts at issue are executory contracts and find that Ms. Stone has rejected the contracts as is her right pursuant to 11 U.S.C. § 365(a).

## EIGHTH CLAIM FOR RELIEF
OBJECTION TO PROOF OF CLAIM NO. 16

180.   Ms. Stone repeats and realleges the paragraphs above and hereby incorporates the same as if set forth in full.

181.   On July 10, 2024, Unison filed Proof of Claim Number 16 in the bankruptcy case.

182.   The Proof of Claim sets forth that the claim is for $0.00. [Claim 16 at 2.]

183.   The Claim further, contradictorily, sets forth that Unison is due $88,352.60. [Claim 16 at 4.]

184.   In support of the Claim, Unison attaches four contracts comprising the Unison HomeOwner Agreement and an assignment.

185.   None of the contracts bear Unison's signature. As a result, they are incomplete and invalid.

186.   The assignment predates Ms. Stone's signature on any of the contracts. As a result, it is invalid.

187.   The proof of claim is based on a void and invalid contract and should therefore be disallowed.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays that this Court award the following relief:

a.   Disallow Claim #16;

b.   A declaration that the transaction at issue is a mortgage loan; and a declaration that the transaction at issue is a consumer loan or, in the alternative, a reverse mortgage;

c.   In the alternative, a declaration that the contracts at issue are executory contracts subject to rejection pursuant to 11 U.S.C. § 365(a);

d.   A declaration that the contracts at issue are void, invalid, unenforceable, and have no legal force or effect;

e.   An injunction against enforcement and transfer or sale of the contracts at issue;

f.   An order the deed of trust filed by Unison with the Weld County Clerk and Recorder is void and must be released;

g.  A declaration that the conduct at issue violates the Colorado Consumer Protection Act and the other laws of Colorado as set forth herein;

h.  Recoupment, set off, and/or other equitable relief, as appropriate;

i.  An award of reasonable costs and attorney fees to Ms. Stone; and

j.  Such further relief as to the Court seems just.


DATED: August 9, 2024

                                Respectfully submitted,

                                */s/ Alex Witteveld*
                                Alex Witteveld, (#41352)
                                Attorney for Debtor/Plaintiff
                                Colorado Legal Services
                                215 W. Oak St., Suite 800
                                Fort Collins, CO 80521

                                */s/ Shennan Kavanagh*
                                Shennan Kavanagh (BBO #655174)
                                *Admitted to the U.S.D.C. District of Colorado*
                                Attorney for Debtor/Plaintiff
                                National Consumer Law Center
                                7 Winthrop Square, 4th Floor
                                Boston, MA 02110
                                617.542.8010
                                skavanagh@nclc.org

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that a true and correct copy of the above Complaint was placed in the U.S. Mail, postage prepaid or delivered electronically via ECF, on August 9, 2024, addressed as follows:

Unison Agreement Corp.
PO Box 26800
San Francisco, CA 94126-6800

Unison Investment Management, LLC
650 California Street, Fl. 1800
San Francisco, CA 94108

Odin New Horizon Real Estate Fund LP
200 Bellevue Parkway, Suite 210
Wilmington, DE 19809

Odin New Horizon Real Estate Fund LP
Ilene Dell'Acqua, Esq.
c/o McCarthy & Holthus, LLP
7700 E. Arapahoe Road, Ste. 230
Centennial, CO 80112

Real Estate Equity Exchange, Inc.
650 California St., Fl. 1800
San Francisco, CA 94108

Real Estate Equity Exchange, Inc.
% Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Standing Chapter 13 Trustee
Adam M. Goodman
P.O. Box 1169
Denver, CO  80201-1169

*/s/ Alex Witteveld*
Alex Witteveld