**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re<br><br>DEBORAH DEE STONE<br><br>Debtor. | Case No. 24-12767 MER<br><br>Chapter 13 |
| DEBORAH DEE STONE,<br><br>Plaintiff,<br><br>v.<br><br>REAL ESTATE EQUITY EXCHANGE, INC; UNISON AGREEMENT CORP.; ODIN NEW HORIZON REAL ESTATE FUND LP; and UNISON INVESTMENT MANAGEMENT, LLC,<br><br>Defendants. | Adversary No. 24-01181 MER |

**MOTION TO DISMISS ADVERSARY COMPLAINT**

# TABLE OF CONTENTS


Introduction ....................................................................................................1

Background ....................................................................................................3

I. Plaintiff Applied for an Option and Corresponded with Unison. ..........................3

II. Plaintiff Received and Accepted a Conditional Offer from Unison. ......................4

III. Plaintiff Received and Executed the Option Documents. ......................................5

Argument ........................................................................................................9

I. Plaintiff's First Claim Fails Because the Option is Not Unconscionable. ..............10

A. Plaintiff Does Not Plausibly Allege Procedural Unconscionability. ................11

B. Plaintiff Does Not Plausibly Allege Substantive Unconscionability. ...............13

II. Plaintiff's Second Claim Should Be Dismissed Because She Does Not Allege an Unfair or Deceptive Practice that Significantly Impacts the Public. ......................................15

A. Plaintiff Fails to Plead Reliance on a False or Misleading Statement. .............15

B. Plaintiff Fails to Plead Significant Public Impact. ..........................................17

III. The Third, Fourth, and Fifth Claims Fail Because the Option Is an Option and Not a Loan. .19

IV. Plaintiff's Allegations of Fraudulent Notarization Do Not Void the Agreement. ..........24

V. Plaintiff's Seventh Claim Should Be Dismissed Because She Fails to Allege an Adequate Basis for Rejection of the Option. ..............................................................26

A. The Option Is Not Executory. ......................................................................26

B. Unison's Interest Is Secured so Rejection Would Violate the Business Judgment Rule and Serve No Useful Purpose. ........................................................28

VI. Plaintiff's Eighth Claim Should Be Dismissed Because Unison's Proof of Claim Adequately Asserts a Basis for Recovery. ..........................................................29

CONCLUSION ................................................................................................32

Defendants Unison Agreement Corp. ("UAC"), Real Estate Equity Exchange, Inc., Odin New Horizon Real Estate Fund LP, and Unison Investment Management, LLC (collectively, "Unison" or "Defendants") hereby move to dismiss the Complaint filed by Deborah Dee Stone (the "Debtor" or "Plaintiff") for failure to state a plausible claim for relief under Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012(b), and for failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7009.

**INTRODUCTION**

In 2018, the Debtor entered into an option agreement with UAC (the "Option") under which she was immediately paid $35,000. In exchange, the Debtor granted UAC a secured option to purchase an undivided 70% interest in her property for an additional $105,000 upon the occurrence of an "Exercise Event" in the future, most likely her sale of the property. The total consideration to be paid for 70% of the property upon an Exercise Event ($140,000) was calculated based upon the agreed-upon value of the property at the time the option was granted ($200,000), which was validated by a third-party appraisal.

Under the Option, Unison and the Debtor share the risks and rewards associated with appreciation or depreciation of the property,[1] and the Debtor continues to use and enjoy her property. If the property is worth more than $200,000 at the time of the Exercise Event (as it would be if the Debtor sold the property today), Unison will make the second ($105,000) payment and the parties will effectively share in the gain 70/30. If the market materially declines as of the Exercise Event, however, Unison likely would not exercise the Option, and the Debtor would keep

[1] The Debtor alleges that UAC assigned its rights and interests in the Option to Odin New Horizon Real Estate Fund LP, Compl. ¶ 83, but also alleges the assignment was "invalid," *id.* ¶ 186.

both the proceeds of her property and the $35,000 payment she received when the Option was granted. Because the outcome depends on the vagaries of the housing market and the Debtor's decisions (*e.g.*, when and whether to sell her home), the parties' respective gain or loss is not preordained. Regardless of the future value of the property, the Debtor took on *no debt*.

The Debtor does not dispute that she received documents describing the Option terms in detail (*e.g.*, Compl. ¶¶ 67-69), that she understood that the outcome of the Option is dependent on the market (*id.* ¶ 72), or that she signed the relevant documents (*id.* ¶ 92). Nonetheless, she asks this Court to declare the Option "invalid and unenforceable." *Id.* ¶ 6. The Complaint asserts eight claims, all of which fail to state a claim under Rule 12(b)(6):

Claims 1 and 2 must be dismissed because the Debtor does not plausibly allege that the Option is unconscionable, unfair, or deceptive. First and foremost, Plaintiff does not identify any statements Unison made to her that were inaccurate or misleading, much less false or unconscionable. Both Plaintiff's allegations and the documents and communications on which they rely (which are properly considered by the Court on this motion), show that the Debtor had ample opportunity to review the terms of the Option and consult with legal and financial advisors of her choice, both of which she attested to Unison that she did before signing. Further, the Debtor fails to plead that her dispute with Unison has significant public impact (nor could she), rather than concerning a private transaction, as required to state a claim under the Colorado Consumer Protection Act, C.R.S. §§ 6-1-101 *et seq.* ("CCPA").

Claims 3, 4, and 5 fail because, in accordance with its express terms, its economic structure, and Colorado law, the Option is plainly an option and not credit or a loan. Directly applicable case law—including district court opinions adjudicating other Unison option agreements—confirms that the Option is an option and not credit or a loan. That conclusion is reinforced by the Colorado

Supreme Court opinion cited in the Complaint, which shows the Option lacks two key hallmarks of a loan: (i) the creation of a repayment obligation at execution, and (ii) growth in that repayment obligation over time. *See Oasis Legal Fin. Grp., LLC v. Coffman*, 361 P.3d 400 (Colo. 2015). Unison has no obligation to exercise the Option, but if it does, the parties' respective gains and losses are determined by the market for the Debtor's property. Because the Option is not a loan, it is not subject to Colorado statutes governing mortgage loans (Claims 3 and 5) or consumer loans (Claim 4).

Plaintiff's request for a declaration that two of the Option documents are invalid as "not properly notarized" (Claim 6) also fails. Colorado law does not require notarization, and Plaintiff admits that she signed the documents.

Finally, Claims 7 and 8 should be dismissed because the Debtor does not allege a basis for rejection of the Option under Bankruptcy Code Section 365(a), and alleges no facts that would support disallowance of Unison's proof of claim.

The Complaint should be dismissed in its entirety.

## BACKGROUND

### I. Plaintiff Applied for an Option and Corresponded with Unison.

The Debtor purchased her condo in October 2016 for $141,500. Compl. ¶ 59. Plaintiff alleges that in late 2018, she "responded to a Unison advertisement" by "call[ing] Unison." *Id.* ¶¶ 60–61. The Complaint provides zero information about the "advertisement" or her alleged phone calls with "Unison representatives." *See id.* ¶¶ 60–64. Nonetheless, Plaintiff alleges that she "understood from talking to Unison that she could take out a loan from them, using her home as collateral" and that "Unison representatives did not reveal the true cost of the transaction." *Id.* ¶¶ 63–64. In reality, a Unison representative repeatedly explained to Plaintiff how the Option would work, including (i) that it is not a mortgage or home equity loan and Unison is not a lender; (ii)

that it is an option contract; and (iii) various hypotheticals of how the option math worked. Ex. 7 at 1; Ex. 13, "5NineCall 12 10 2018 03 56pm EST" at 9:00–10:45, 41:50–44:44; *see generally* Ex. 1.[2]

The Debtor acknowledges she understood that the outcome of the Option would depend on market conditions, *see* Compl. ¶ 72, and even shared with a Unison representative her own "work sheet" of "the Option Math calculation." Ex. 8 at 4 (Dec. 11, 2018 email from D. Stone).[3] Although it does not appear she accepted the invitation, Unison also offered to send "a sample version of the legal documents that make up" the Option. Ex. 5 at 2 (Nov. 12, 2018 email to D. Stone). Plaintiff alleges that "[b]ased on the representations made by the Unison representatives . . . [she] decided to move forward with the transaction." Compl. ¶ 66.

## II. Plaintiff Received and Accepted a Conditional Offer from Unison.

On or around December 18, 2018, "a Unison representative emailed a nineteen-page series of documents to the Debtor," identified as "an 'Offer to enter into a Unison HomeOwner Agreement." *Id.* ¶¶ 67–68; *see* Ex. 1. The offer package explained the financial terms of the Option and how it would operate. On the first page of the cover letter, Unison again offered to provide "a full copy of the legal agreements that comprise the Unison HomeOwner Agreement" to the Debtor upon request, directing her to contact her program specialist "and they will be provided to you." *Id.* at 1. The same page provided contact information for Plaintiff's "Program Specialist," *id.*, which she also had from prior communications. *See* Exs. 4–9.

---

[2] Plaintiff repeatedly refers to and relies upon phone discussions, email correspondence, and documents she received from Unison in alleging deception and unconscionability. Compl. ¶¶ 61, 63, 64, 66, 67–69, 71–72, 74, 76–78, 80–86, 101. Accordingly, the referenced communications and documents are properly considered by the Court on this motion. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997); *infra* p. 10. Unless otherwise indicated, cited Exhibits are attached to the concurrently filed Certification of Counsel in Support of Defendants' Motion to Dismiss.

[3] Unless otherwise indicated, all emphasis in this motion is in the original document.

The offer package included an "**IMPORTANT INFORMATION NOTICE AND TOTAL UNISON COST ESTIMATE (TUCE)**," which the Debtor was told to "**Please Read Carefully**." Ex. 1 at 5. At the top of the first page, that document directed:

> **If you have not already discussed the Unison HomeOwner Agreement with your own advisors (legal, financial, estate planning, tax) and family members, we strongly urge you to do so before proceeding any further.** You may want to consider other financial alternatives available to you, as well as the risks associated with this transaction.

*Id*. The offer package also identified several "**Conditions Required Prior to Signing**," which "must be satisfied" or Unison would "treat this Offer as expired," including Plaintiff "execut[ing] closing documents." *Id*. at 4. On December 19, 2018, Plaintiff signed an **Acknowledgement of Acceptance**, "affirm[ing] that [she] ha[d] read and underst[ood] the Offer Package" and "accepting the Offer in accordance with its terms." *Id.* at 2.

## III. Plaintiff Received and Executed the Option Documents.

On December 19, 2018, Unison emailed the Debtor copies of draft Option agreement documents. Ex. 11. Three days later, on December 22, 2018, Plaintiff signed the Option documents. Compl. ¶¶ 92–93; Ex. 2-1 at 5; Ex. 2-2 at 35; Ex. 2-3 at 5; Ex 2-4 at 10. The key documents for purposes of this motion are the Option Agreement and Covenant Agreement. The documents summarize the nature of the transaction in plain language. For example, the cover page of the Option provides:

> Deborah Dee Stone ("**Owner**") hereby grants to Unison Agreement Corp., a Delaware corporation, and its successors and assigns ("**Investor**"), an option ("**Option**") to purchase, in the future, an undivided 70.00% interest (the "**Investor Percentage**") in and to that certain residential real property known as 202 Lucca Dr, Evans, CO 80620 and further described in the attached **Exhibit A** (the "**Property**") for the Unison Purchase Price of $140,000.00 ("**Unison Purchase Price**"). The Option is granted by Owner in partial consideration of Investor's providing Owner with an advance of funds in the amount of $35,000 (the "**Unison Investment Payment**").

Ex. 2-1 § 1(a).[4] The documentation Plaintiff signed again implored her to "**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT**," and "**urged [her] to discuss the Unison HomeOwner Agreement with family members, heirs, and with independent tax, legal and financial advisors to ensure an understanding of their risks and benefits**." Ex. 2-2 § 2.3 & p. 35; Ex. 2-3 at 3. The Debtor agreed that she "**reviewed, and understands the risks and benefits of, the Unison HomeOwner Agreement**" and "**had the opportunity to [consult with family members and advisors] to [her] full satisfaction**." Ex. 2-2 § 2.3 & p. 35.

The agreements then set forth: the initial payment to be made by Unison (Ex. 2-1 § 1(a)), the granting of the Option with the payment of two amounts, one at signing and one at option exercise (*id.* §§ 1(a), 1(c)), the Term of the Option (*id.* § 2), the agreed value of the property at Option origination (*id.* § 4), the Exercise Events under which the Option can be exercised (*id.* § 2),[5] a right for the homeowner to buy out the Option upon an Exercise Event (*id.* § 10; Ex. 2-2 §§ 3.3, 10.1), the maximum amount of debt with other parties that can be placed on the property so that the Option will remain exercisable (Ex. 2-1 § 8), a statement that the Security Instrument and Recorded Memorandum will be filed to secure the HomeOwner Agreement (*id.* § 9), the nature of the option and of the initial payment (*id.* § 6), and a description of the property (*id.* at Ex. A).

As to the nature of the option, the Option states:

> **The Unison Investment Payment [(which is the initial payment)] is not a loan. The Unison Investment Payment is not a principal amount which [Unison] is contractually or otherwise entitled to recover at Term or at Option Exercise. The Investor Proceeds [(i.e., the net amount obtained by Unison at option**

---

[4] The Unison Purchase Price of $140,000 ($35,000 initial payment + payment of an additional $105,000 upon Option exercise) is equal to 70.00% of the $200,000 Agreed Value of the Debtor's property. *See* Ex. 2-1 §§ 1, 4. Plaintiff alleges conclusorily that that this $200,000 figure "was not the true value" of her condo, but offers no support for her speculation, and it represents a more than 40% increase in value over the price she paid two years earlier. *Compare* Compl. ¶ 59 (purchased in October 2016 for $141,500) *with id.* ¶ 69 ($200,000 Agreed Value in December 2018).

[5] The Exercise Events are (a) the Expiration Date; (b) arms' length sale of the Property; (c) death of the last surviving owner; or (d) following a material and uncured event of owner default ("Event of Default"). Ex. 2-1 § 2.

> **exercise)] may be greater than, equal to, or less than the Unison Investment Payment, or zero, depending upon the change in the value of the Property (the difference between the Original Agreed Value and the Ending Agreed Value) between the Effective Date and the Exercise Event. Owner will not be required to make any monthly interest or other periodic payments to [Unison] calculated upon the amount of the Unison Investment Payment, nor will any periodic payment obligations be imposed upon or accrue on the amount of the Unison Investment Payment as indebtedness to Owner.**

*Id.* § 6. The Covenant Agreement includes representations and warranties and covenants associated with the Option and addresses potential events not alleged to have occurred here. Ex. 2-2.[6]

As explained in the Option, Unison makes an initial payment when the Option is signed and, in exchange, receives an option to purchase an undivided interest in the real property by making a payment of an additional sum certain. Ex. 2-1 §§ 1(a), 1(c). Unison may not exercise the option, however, until a specified trigger "Exercise Event" occurs, none of which are within Unison's control. *See id.* § 2. The most common exercise event is the owner's sale of the property, and when a sale occurs, the homeowner may elect to settle the Option and terminate it with the proceeds of a sale disbursed as follows: (1) Unison receives the sale price multiplied by the percentage undivided interest it can purchase minus the second payment Unison must make in exercising the Option, and (2) the homeowner receives the sale price multiplied by the homeowner's percentage in the property plus the second payment from Unison. *Id.* § 10; Ex. 2-2 §§ 3.3(b), 10.1(a).[7]

Applying the terms of the Option to historical measures of housing prices shows how the option economics work. For illustration, assume the Option was granted in June 2006 on property

[6] The other two documents, the Recorded Memorandum (Ex. 2-3) and the Deed of Trust (Ex. 2-4), are filed to place third parties on notice of the Option and secure the homeowner's performance under the Covenant and Option.

[7] The mechanics of Unison's exercise of the Option involve allowing the homebuyer to choose to settle the Option, at the time of sale, through a cash payment from proceeds of the sale. Otherwise, Unison can consummate the purchase of the undivided percentage interest simultaneously with the property sale. Ex. 2-2 § 3.3(c).

of the same value as Plaintiff's and the home value followed the S&P/Case-Shiller U.S. National Home Price Index (CSUSHPINSA), which is made available by the St. Louis Federal Reserve Bank.[8] Starting in August 2006, housing prices began to decline. Possible outcomes for the June 2006 option under the Debtor's terms include:

- **<u>A Total Loss to Unison and Loss Mitigation for Plaintiff</u>**. If the property had sold in January 2012 (when the index was below 138), the price drop would have been over 25% and the option would not have been exercised. Plaintiff would have kept the initial $35,000 payment without Unison exercising the option. Plaintiff would have received the entire sale price of the property, with no money going to Unison at any point.[9]

- **<u>Partial Loss for Unison and Loss Mitigation for Plaintiff</u>**. If the property had sold between May 2012 through October 2016 (when the index was between 138 and 184), there would have been a price drop, but Unison would have exercised the option. Unison would have received some sale proceeds, but they would have been less than the initial payment to Plaintiff ($35,000). Plaintiff again would have received more than the entire sale price of the property.[10]

- **<u>Break-Even and Benefit of Up-Front Payment to Plaintiff</u>**. In December 2016, the price index was nearly the same as June 2006 (*i.e.*, 184.39 vs. 184.55). In this scenario, Unison and Plaintiff would have effectively broken even, but with Plaintiff having had the benefit of Unison's up-front initial payment since June 2006.

---

[8] *See* https://fred.stlouisfed.org/series/CSUSHPINSA (providing monthly data from January 1987 through July 2024). The CSUSHPINSA is subject to judicial notice as a governmental website and thus properly considered on this motion. *See Garling v. U.S. Envtl. Protection Agency*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017); *Spikes v. Car Toys, Inc.*, No. 21-681, 2024 WL 4135234, at *1 n.2 (D. Colo. Sept. 10, 2024); *Palmer v. City & County of Denver*, No. 18-1003, 2019 WL 8223558, at *8 n.7 (D. Colo. Mar. 19, 2019).

[9] For example, if the property were sold in January 2012, the price would have decreased 27.3% (index at 184.55 dropped to 134.17), the sale price would have been $145,400, and an undivided 70% interest would have been worth $101,781. Because the $105,000 second payment Unison would have had to make to exercise the option would have been more than the $101,780 interest Unison could purchase, it would not have exercised the Option. The Debtor would have received the $35,000 initial payment and the entire sale price, meaning that because of the Option she received $180,400 in connection with a property she sold for only $145,400.

[10] For example, if the property were sold in February 2014, the price would have decreased 13.4% (index at 184.55 dropped to 159.87), the sale price would have been $173,200 and an undivided 70% interest would have been worth $121,240. Because the $105,000 second payment Unison would have had to make to exercise the option was less than the $121,240 interest Unison could purchase, it would have exercised the Option to mitigate its loss to -$18,760 ($121,240 - $105,000 second payment - $35,000 initial payment). Plaintiff would have received 30 percent of the sale price which is $51,960 plus the second payment of $105,000, in addition to the $35,000 initial payment, for a total of $191,960 in connection with a property she sold for only $173,200.

- **<u>Profitable for Unison and for Plaintiff</u>**. Starting in January 2017, the price index was higher than in June 2006, with a 50% rise in price from the June 2006 option date first reached in December 2021, over 15 years after the option issued.[11]

## <u>ARGUMENT</u>

In evaluating a Rule 12(b)(6) motion, a court's task is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). To do so, a complaint must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the court is not required to accept as true a "legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, courts "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

In considering a motion to dismiss, the court considers not only the complaint itself, but also "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The court is also entitled to consider documents "referred to in the complaint" and "central to the plaintiff's claim." *GFF Corp.*, 130 F.3d at 1384. This rule is necessary because "otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff relied." *Id.*

---

[11] "Unison Gain [or] (Loss) On Investment" under hypothetical scenarios falling into these categories—increase in property value, "larger increase," decrease in property value, "larger decrease," and no change—was laid out in Plaintiff's Offer package. *See* Ex. 1 at 12.

## I. Plaintiff's First Claim Fails Because the Option is Not Unconscionable.

The Court should dismiss Claim 1 because the Option is not unconscionable. Colorado "recognize[s] a strong policy of freedom of contract." *Ravenstar, LLC v. One Skill Hill Place, LLC*, 401 P.3d 552, 555 (Colo. 2017). As a result, "[c]ontracts between competent parties, voluntarily and fairly made, should be enforceable according to the terms to which they freely commit themselves." *Id.* (internal citations and quotations omitted). "[D]eclar[ing] a contract void for being in violation of public policy is a very delicate and undefined power and . . . should be exercised only in cases free from doubt." *Armed Forces Bank, N.A. v. Hicks*, 365 P.3d 378, 385 (Colo. App. 2014) (internal citations and quotation marks omitted).

"In Colorado, for a contract to be unconscionable, it must be both substantively and procedurally unconscionable." *Vernon v. Qwest Commc'ns Int'l, Inc*., 925 F. Supp. 2d 1185, 1194 (D. Colo. 2013). The Colorado Supreme Court has identified seven factors as relevant to evaluating unconscionability: (1) the use of a standardized agreement executed by parties of unequal bargaining power; (2) a lack of opportunity to read or become familiar with the document before signing it; (3) use of fine print in the portion of the contract containing the challenged provision; (4) an absence of evidence that the provision in question was commercially reasonable or should reasonably have been anticipated; (5) the terms of the contract; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) the circumstances surrounding the formation of the contract. *Id* (citing *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo. 1986)).

Although it is her burden to "demonstrate[] both procedural *and* substantive unconscionability," *Am. Family Mut. Ins. Co. v. Tamko Building Prods., Inc.*, 178 F. Supp, 3d 1121, 1127 (D. Colo. 2016), Plaintiff does not plausibly allege either.

**A. Plaintiff Does Not Plausibly Allege Procedural Unconscionability.**

The first, second, third, sixth, and seventh factors relate to procedural unconscionability. *Vernon*, 925 F. Supp. 2d at 1195. As to the first factor, "the times in which consumer contracts were anything other than adhesive are long past." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346–47 (2011). Thus, a "standardized agreement between parties with unequal bargaining power . . . is not enough for a finding of procedural unconscionability." *Vernon*, 925 F. Supp. 2d at 1195; *see also Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 852 (10th Cir. 1986).

The second factor looks to whether the plaintiff had an "*opportunity* to read the [document] before signing it." *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1274 (10th Cir. 2020) (emphasis added). "Absent fraud or concealment, a person who signs a document is presumed to have knowledge of the document's contents, independent of whether that person has read the document." *Jajack v. New York Life Ins. Co.*, No. 20-1590, 2020 WL 8269316, at *5 (D. Colo. Dec. 28, 2020). Thus, "[a] party may not avoid a contract's obligations by denying reading it, and it is presumed from the act of signing . . . a contract that the party understood it." *Id.*; *see also Levine v. Vitamin Cottage Natural Food Markets, Inc.*, No. 20-261, 2021 WL 4439800, at *14 (D. Colo. Sept. 27, 2021).

Plaintiff does not allege that she was denied an opportunity to read the Option documents before signing. She does not contend, for example, that she was "compelled to immediately [sign] the documents," "prevented . . . from taking the time [s]he needed to review" them, or that she "requested additional time to review the document[s]" and was "refused." *See McGuire v. CarMax Bus. Servs. LLC*, No. 23-2938, 2024 WL 3897073, at *10 (D. Colo. Aug. 16, 2024), *report and recommendation adopted*, 2024 WL 4027964 (D. Colo. Sept. 3, 2024); *Levine*, 2021 WL 4439800,

at *14.[12] To the contrary, the Debtor was emailed copies of the documents three days before she signed them—and was offered copies more than a month in advance. Ex. 5 at 2; Ex. 11.

With respect to the third factor, Plaintiff cannot plausibly allege that key provisions were buried in "fine print," *Platt*, 960 F.3d at 1275, or otherwise "hid[den] or conceal[ed]," *Jajack*, 2020 WL 8269316, at *5. Instead, both the Offer Package and the Option Agreement state the key terms of the Option on their respective first pages in "normal print consistent with other clauses in the contract." *Rocky Mountain Chocolate Factory, Inc. v. SDMS, Inc.*, No. 06-1212, 2007 WL 4268962, at *7 (D. Colo. Nov. 30, 2007); *see* Ex. 1 at 1, Ex. 2-1 at 1; *cf. PostNet Int'l Franchise Corp. v. Amercis Int'l, Inc.*, No. 06-125, 2006 WL 1775599, at *2 (D. Colo. June 26, 2006) ("reject[ing] the suggestion that a term of a contract is not conspicuous merely because it is contained on the next to last page of the contract; is not in a distinctive typeface; or does not have a particularized caption summarizing its content"). Unison also directed Plaintiff to "**Please Read**" the documents "**Carefully**" and "**<u>strongly urge[d]</u>**" her to "**<u>discuss[] the Unison HomeOwner Agreement with your own advisors (legal, financial, estate planning, tax) and family members</u>**." Ex. 1 at 5; *see also* Ex. 2-2 § 2.3 & p. 35. Plaintiff promised that she had read the documents, understood them, had received answers to any questions, and had consulted the advisors and family members of her choice. Ex. 1 at 10; Ex. 2-2 § 2.3 & p. 35.

The sixth factor considers the relationship of the parties, including assent, unfair surprise, and notice. While Plaintiff claims she lacks "a sophisticated understanding of complex financial transactions," Compl. ¶ 119(a), she does not allege that her assent to the Option "was coerced through undue influence or duress" or that she was "pressured" to sign the Option "without taking

[12] Plaintiff claims Unison "provided no meaningful explanation" of the contract and "simply instructed her to sign," (Compl. ¶ 119(e)), but cites no authority for the principle that Unison was obligated to affirmatively walk her through the terms of the contract. In any event, the Complaint's allegations are refuted by the record. *Supra* pp. 4–5.

time to review or consider its terms." *See Turner v. Chipotle Mexican Grill, Inc.*, No. 14-2612, 2018 WL 11314701, at *3 (D. Colo. Aug. 3, 2018) (rejecting argument that plaintiffs' status as "inexperienced, under-educated, relatively unsophisticated, low hourly-wage workers very much in need of the job" supported a finding of unconscionability).

Finally, the Debtor alleges technical defects in the contract, namely that Defendants allegedly "assigned the documents prior to [Plaintiff] even entering the agreement" and "falsely affixed a notary block and signature to the documents." Compl. ¶¶ 119(f), 119(g). Even accepting her allegations as true, Plaintiff offers no authority for the proposition that either of these purported defects would amount to procedural unconscionability. Indeed, because neither has any bearing on whether there was "some overreaching on the part of one of the parties . . . an inequality of bargaining power or . . . an absence of meaningful choice on the part of one of parties," they do not. *See Davis*, 712 P.2d at 991.

**B. Plaintiff Does Not Plausibly Allege Substantive Unconscionability.**

The final two factors of the unconscionability analysis, the terms of the contract, and whether they are "commercially reasonable or should reasonably have been anticipated," relate to substantive unconscionability. *Turner*, 2018 WL 11314701, at *2.

"People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain." *Lincoln Gen. Ins. Co. v. Bailey*, 224 P.3d 336, 341 (Colo. App. 2009) (quoting *Univ. Hills Beauty Acad. Inc. v. Mountain States Tel. & Tel. Co.*, 554 P.2d 723, 726 (Colo. App. 1976)). Thus, a contract is not unconscionable merely because the plaintiff decides it "turned out"—or, here, has the potential—"to be unfavorable." *Rocky Mountain Chocolate*, 2007 WL 4268962, at *6. Instead, to be unenforceable, there must be both "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable" to the other party. *Mullan*,

797 F.2d at 850 (quoting *Davis*, 712 P.2d at 991). To satisfy this standard, an agreement must be "so unconscionable that no decent, fair-minded person would view the ensuing result without being possessed of a profound sense of injustice." *Lincoln Gen.*, 224 P.3d at 341 (cleaned up).

As discussed in detail below, the terms of the Option are consistent with the established practice of granting options and are reasonable. *Infra* Section III. Those terms "should have reasonably [been] anticipated" by the Debtor because they were repeatedly disclosed and explained to her, both orally and in writing. *Supra* pp. 4–8. Nor are the terms of the Option profoundly unjust or unfair, as another federal court recently held. *See Olson v. Unison Agreement Corp.*, No. 22-1859, 2023 WL 5609251, at *2 (W.D. Wash. Aug. 30, 2023) (granting motion to dismiss complaint alleging Unison HomeOwner Agreement was deceptive or unfair). In fact, while the HomeOwner Agreement is not a loan, regulators and governmental organizations have encouraged lenders to offer shared appreciation economics in loan products to make loans more affordable and and/or available.[13] There is nothing unconscionable about those economics. Finally, "[n]othing in the record suggests [the Debtor] was compelled to" to sell Unison the Option. *Weller v. HSBC Mortgage Servs., Inc.*, 971 F. Supp. 2d 1072, 1081 (D. Colo. 2013). The Debtor does not dispute that she could have sought funds through another source, or not at all. *Cf. Mullan*, 797 F.2d at 853 (holding disclaimer was not unconscionable because plaintiff "had the opportunity to buy a similar package elsewhere").

---

[13] *See* FHA: Strengthening the Home Equity Conversion Mortgage Program, 82 Fed. Reg. 7094, 7094 (Jan. 19, 2017) (issuing final rule authorizing shared appreciation and rejecting comments that shared appreciation should not be utilized because it is a negative for homeowners); *Selling Guide Announcement (SEL-2023-04)*, Fannie Mae (May 23, 2023), https://singlefamily.fanniemae.com/media/35881/display (reaffirming Fannie Mae's support for three types of shared equity programs and changing the rules so that additional home purchasers are eligible and the shared appreciation programs can be made more broadly available); *California Dream For All: A Proposed Shared Appreciation Loan Investment Fund For The State of California*, California State Treasurer's Office (June 6, 2022), https://www.treasurer.ca.gov/publications/ca-dream-for-all-report.pdf (California treasurer advocating for California to spend $10 billion on a shared appreciation program because lenders are not sufficiently offering shared appreciation; program was subsequently approved by the legislature and governor and is being operated by the California Housing Finance Agency).

## II. Plaintiff's Second Claim Should Be Dismissed Because She Does Not Allege an Unfair or Deceptive Practice that Significantly Impacts the Public.

The second claim alleges that Unison violated the CCPA by making "false and misleading" statements. Compl. ¶ 124.[14] Stating a claim under the CCPA requires a plaintiff to allege that (1) the defendant engaged in an unfair or deceptive trade practice; (2) in the defendant's business; (3) the challenged practice significantly impacted the public; (4) the plaintiff suffered injury in fact; and (5) the challenged practice caused the plaintiff's injury. *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1301 (10th Cir. 2022); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo. 2003) (en banc).

CCPA claims alleging false statements or deception are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *Faulhauber v. Petzl Am., Inc.*, 656 F. Supp. 3d 1257, 1267 (D. Colo. 2023); *McDaniel v. Denver Lending Grp., Inc.*, No. 08-2617, 2009 WL 1873581, at *6 (D. Colo. 2009). Further, a plaintiff who does not allege reliance upon allegedly deceptive information "cannot show a causal link between a defendant's deceptive trade practices and the plaintiff's injury" and fails to state a claim. *Peterson v. USAA Life Ins. Co.*, 353 F. Supp. 3d 1099, 1114 (D. Colo. 2018).

### A. Plaintiff Fails to Plead Reliance on a False or Misleading Statement.

To state a claim, the Debtor must "allege facts sufficient to support the inference that [defendants] knowingly engaged in a deceptive trade practice which [she] *relied upon*." *Crowe v. Tull*, 126 P.3d 196, 211 (Colo. 2006) (en banc) (emphasis added); *see also Peterson*, 353 F. Supp. 3d at 1114 (dismissing CCPA claim because plaintiff did not allege he "saw or relied upon any deceptive information before he completed his life insurance application"). Further, to satisfy Rule

---

[14] The Complaint also reproduces various provisions of the CCPA, *see* Compl. ¶ 125, but allegations which merely parrot the language of a statute are not entitled to credence. *Twombly*, 550 U.S. at 555.

9(b), she must allege "the time, place and contents of the [allegedly] false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000); *Faulhauber*, 656 F. Supp. 3d at 1267. This requires, "[a]t a minimum . . . the who, what, when, where and how of the alleged fraud." *Tatten v. Bank of Am. Corp.*, 912 F. Supp. 2d 1032, 1040 (D. Colo. 2012).[15] In short, Plaintiff must allege *what* misrepresentations were made to her, *when*, *where*, *how*, and by *whom*.

She does none of these things. For example, the Complaint selectively quotes from the Unison website (Compl. ¶¶ 40, 46), Marin Magazine (*id.* ¶ 56), and a podcast on the Fin Tech Nexus website (*id.* ¶ 41), but Plaintiff does not allege she visited the Unison webpage, read Marin Magazine, or listened to the Fin Tech podcast before entering into the Option—let alone relied on them in deciding to do so. Instead, Plaintiff says she "responded to a Unison advertisement" by "call[ing] Unison," and "decided to move forward with the transaction" based on "representations made by the Unison representatives." *Id.* ¶¶ 60–61, 66. Plaintiff does not allege any information about the "advertisement"—such as what it said or when and how she saw, heard, or received it. *See id.* ¶ 60. She does not allege that it contained any false or misleading statements. *See id.*

Plaintiff also fails to provide any detail about her alleged "call[s]" with "Unison representatives," such as when they occurred, who she spoke with, and what was discussed or allegedly not "revealed." *See id.* ¶¶ 61, 64, 66.[16] The need to identify the specific statements that

---

[15] To the extent she alleges material omissions, Plaintiff must identify "the particular information that should have been disclosed, the reason the information should have been disclosed, the person who should have disclosed it, and the approximate time or circumstances in which the information should have been disclosed." *S.E.C. v. Nacchio*, 438 F. Supp. 2d 1266, 1278 (D. Colo. 2006); *see, e.g.*, *Hansen v. Auto-Owners Ins. Co.*, No. 09-2736, 2010 WL 749820, at *3 (D. Colo. Mar. 4, 2010) (dismissing CCPA claim because plaintiff failed to specifically "identify what material information Defendant failed to disclose").

[16] While Plaintiff alleges she decided to agree to the Option because she understood from "Unison representatives" that she would not have to pay anything "until the house was sold," Compl. ¶ 66, she does not specify what she was told. Nor does she allege that her understanding about the payment structure is untrue. *See also supra* pp. 8–9.

Plaintiff alleges to have been false or misleading—and why—is particularly critical here, where Plaintiff spent more than an hour on the phone with Unison representatives across multiple days asking questions and discussing how the Option would work, including walking through the "Option math." *Supra* pp. 4–5; Ex. 13.

Finally, while Plaintiff asserts that the Offer package sent to her via email was "confusing" and "misleading," Compl. ¶¶ 71–72, she does not explain where or how. And, notably, her conclusory allegations are refuted by the very documents themselves, which she was directed to not only "**Please Read Carefully**," but also discuss with her "own advisors . . . and family members." Ex. 1 at 5, 10; *see also* Ex. 2-2 § 2.3 & p. 35. Plaintiff promised Unison that she did so. Ex. 1 at 5; *cf. Olson*, 2023 WL 5609251, at *2 (finding "allegations of deceptive conduct . . . belied by the plain text of the HomeOwner Agreement and accompanying documents," including admonitions for plaintiff to "discuss[] the HomeOwner Agreement with your own advisors and family members").

**B. Plaintiff Fails to Plead Significant Public Impact.**

Even if she had adequately pled reliance on a false or misleading statement by "Unison representatives," Plaintiff's claim would still fail. "The CCPA is not intended to provide additional remedies to claimants whose disputes have no public impact but are, instead, purely private transactions." *Adams v. FedEx Ground Package System, Inc.*, No. 11-2333, 2013 WL 1164426, at *7 (D. Colo. Mar. 1, 2013), *report and recommendation adopted*, 2013 WL 1163952 (D. Colo. Mar. 21, 2013), *aff'd*, 546 F. App'x 772 (10th Cir. 2013). Thus, to state a CCPA claim, "a plaintiff must establish not only that the defendant engaged in a deceptive trade practice, but also that the

defendant's challenged practice significantly impacts the public." *Rhino Linings*, 62 P.3d at 149-50 (identifying relevant factors).

That a particular business is of a public nature or otherwise generally affects the public interest is insufficient to establish the requisite public impact. *See Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 155–56 (Colo. 2007) (en banc). It is also not enough to allege that other individuals have entered into agreements with the defendant, or that the defendant has made misleading statements publicly. *See Adams*, 2013 WL 1164426, at *7 (dismissing claim for failure to plead public impact where plaintiff "merely alleges that FedEx induced her and 'over 3,000' persons to enter into the Operation Agreement"); *Exam. Bd. of Prof'l Home Inspectors v. Int'l Ass'n of Certified Home Inspectors*, 519 F. Supp. 3d 893, 920 (D. Colo. 2021), *aff'd*, 36 F.4th 1238 (10th Cir. 2022) ("the fact that numerous people heard or saw [deceptive] statements is insufficient" to show that they "caused a substantial public impact"). "The fact that [an] alleged deceptive practice is one which *could* be replicated with other consumers is [likewise] insufficient." *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1124 (D. Colo. 2010); *see also Johnstown Feed & Seed, Inc. v. Cont'l W. Ins. Co.*, 641 F. Supp. 2d 1167, 1181 (D. Colo. 2009) ("[T]hat a[n] . . . insurer and an insured have a dispute over a claim does not necessarily mean that other members of the public are or have been affected by the insurer's practices."); *Frias v. Chris the Crazy Trader, Inc.*, 604 F. App'x 638, 643 (10th Cir. 2015) (affirming dismissal on the ground that impact on 12 consumers "was insufficient to show significant public impact"). But, beyond vague and unsupported conclusions, that is all that Plaintiff offers here. *See* Compl. ¶¶ 16,

40–41, 46 (citing statements on website and Fin Tech podcast and alleging Unison operates in multiple states).

The private nature of Plaintiff's dispute is evident from her allegations of deception, which hinge on unspecified statements allegedly made during phone calls with unnamed Unison representatives—"conduct that is unique to the particular transaction between" the Debtor and Unison. *Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 528 (Colo. App. 2008); *see also Henson v. Bank of Am.*, 935 F. Supp. 2d 1128, 1142 (D. Colo. 2013) (dismissing claim involving "a private transaction involving the [plaintiffs'] personal residence" because plaintiffs failed to allege *facts* showing other homeowners were treated the same); *Crowe*, 126 P.3d at 211 ("[I]f [plaintiff] fails to allege an injury other than a private wrong caused only by the poor advice of his attorney, the injury will lack public impact and will be too narrow in scope to be covered by the CCPA."). The injury that Plaintiff asserts—allegedly being "trapped in her home without the ability to sell to recoup any of her home equity after paying off [her] other home secured loans," Compl. ¶ 117—is also uniquely personal.

Like her failure to plausibly plead a false representation, Plaintiff's inability to allege significant public impact independently dooms her CCPA claim.

## III. The Third, Fourth, and Fifth Claims Fail Because the Option Is an Option and Not a Loan.

The third, fourth, and fifth Claims are premised upon the Option being a loan. *See, e.g.*, Compl. ¶¶ 131, 142, 157. But the Option falls within the well-understood parameters of what constitutes an option, and is thus *not* a loan, requiring dismissal of these claims.

The common definition of an "option" is "a contract conveying a right to buy or sell designated securities, commodities, or property interest at a specified price during a stipulated period." *Option 2(c)*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary

/option. The Colorado Supreme Court has defined an option for the sale of property in similar terms: "a unilateral contract which is obligatory on the optionor and non-obligatory on the optionee until the latter makes an election to accept the offer contained in the option." *Shull v. Sexton*, 154 Colo. 311, 316 (1964) (en banc) (collecting cases). Colorado's Property statute reflects the legislature's view that an option is not a loan nor is it a mortgage. *See* C.R.S. § 38-38-100.3(5.3) (defining a 'consensual lien' on real property to separately include options, leases, and mortgages); *Province v. Johnson*, 894 P.2d 66, 68 (Colo. App. 1995) (citing C.R.S. § 38-35-111) ("[A]n option to purchase property is an interest affecting title to such property."); C.R.S. § 38-35-127(2)(b) (separately defining an option and a mortgage for purposes of transfer fee covenants).

To be valid under Colorado law, an option agreement for the sale of land or any interest in land must "be in writing and must contain the names of the parties, the terms and conditions, a description of the interest or property, and the consideration." *Schreck v. T & C Sanderson Farms*, 37 P.3d 510, 513 (Colo. App. 2001); *Boyer v. Karakehian*, 915 P.2d 1295, 1298 (Colo. 1996) (en banc) ("[As] a purchase option is a contract for the sale of an interest in land, it is required by statute to be in writing." (citing C.R.S. § 38-10-108)). So long as these requirements are met, Colorado courts enforce options to purchase real property. Here the terms of the option meet these requirements and show that the transaction is an option in fact.

It is undisputed that the Option is in writing, that it is between Plaintiff and Unison, that Unison paid Plaintiff significant consideration ($35,000) in exchange for the Option, the circumstances pursuant to which Unison can exercise the Option, and the payment that Unison must make to Plaintiff upon exercise ($105,000). Compl. ¶¶ 67, 69, 103; Ex. 2-1 § 1. If Unison exercises the Option, it then "ripen[s] into a mutually binding and mutually enforceable contract" to sell an interest in real property. *Shull*, 154 Colo. at 316; *see also Polemi v. Wells*, 759 P.2d 796,

798 (Colo. App. 1988) ("When [an option] is exercised according to its terms, there is a binding contract to sell, and the owner cannot refuse to convey the property."). Simply put, the transaction is an option and the documents' characterization of it as an option is not a sham.[17]

In contrast, the Option is not a loan. Colorado's mortgage lending statutes define a residential mortgage loan as a "loan" made "primarily for personal, family, or household use," that is "secured by a mortgage, deed of trust, or other equivalent, consensual security interest" on a dwelling or residential real estate. C.R.S. § 12-61-902(8); *id*. at § 38-38-100.3(21.3). The statute does not define the term "loan," but the Option is not a loan under other definitions, including Colorado's Uniform Consumer Credit Code ("UCCC"), which defines a "loan" as the "creation of debt by the lender's payment of or agreement to pay money to the consumer." *Id*. at § 5-1-301(25)(a)(I). As explained by the Colorado Supreme Court, although there are many definitions of debt, "as a general matter, it echoes the foregoing statutory language that 'debt' is 'a specific sum of money due by agreement or otherwise.'" *Oasis*, 361 P.3d at 407 (quoting *Black's Law Dictionary* 462 (9th ed. 2009)); *see also* C.R.S. 38-38-100.3(8) (defining "debt" as "a promise to pay or a right to the payment of a monetary obligation"). Here there is no "specific sum or money due," but rather an option that could be in or out of the money at the time the option becomes exercisable and any gain or loss is unknowable at the outset.

Indeed, as other federal courts have held at the motion to dismiss stage, the Unison Option and similar options do not create debt because they do not create an obligation to repay. For

[17] Colorado law imposes a very high standard to recharacterize a transaction as a loan and an instrument as a mortgage, requiring clear and convincing evidence. *See Sw. Motels v. Rollnick Stores*, 157 Colo. 293, 294 (1965) (holding that a transaction entered into after discussing a loan in which there was a $50,000.00 sale of a motel–an amount sufficient to redeem it from a foreclosure sale—and an option to repurchase in two years for $55,000 "fell far short of" meeting the clear and convincing standard for recharacterizing to a loan); *Arch A. Edwards Post No. 252 v. Gould*, 356 P.2d 908, 909–910 (1960) (affirming decision that plaintiff did not meet even a preponderance of the evidence standard where a transaction was documented as a sale after discussions about a loan on a distressed property and the economics were a sale for $72,214.33 after being offered at $210,000 and a side agreement for a two-year option to repurchase for $10,000 more than the sale price).

example, in *Foster v. EquityKey*, EquityKey (like Unison here) paid the plaintiff a significant sum to purchase an option to participate in appreciation of his real property, which was secured by a deed of trust securing performance obligations. *Foster v. EquityKey Real Est. Invs.*, No. 17-00067, 2017 WL 1862527, at *1–2 (N.D. Cal. May 9, 2017). The plaintiff sued under the federal Truth in Lending Act ("TILA"), arguing that EquityKey fraudulently concealed that the agreement was a loan. *Id*. at *2.[18] The district court disagreed, pointing to the fact that the plaintiff in that case owed no debt and "there [was] no guarantee that the payment received by [plaintiff] need ever be returned," considering that EquityKey "[was] not obliged to exercise its option." *Id*. at *4. Because the *Foster* plaintiff "did not agree to 'repay absolutely,'" the option was "not a loan." *Id*. at *4 (quoting *In re Grand Union Co*., 219 F.353, 356 (2d Cir. 1914)).

Judge Jones of the Western District of Washington followed *Foster* in holding that the same option agreement challenged by the Debtor "is an option contract" that created "an option to participate in the appreciation of [the Plaintiffs'] property" and "is not a loan." *Olson*, 2023 WL 5609251, at *2. The Unison HomeOwner agreement "is not a loan" because "Unison is not obliged to exercise its option." *Id.*; *see also Goldwater Bank, N.A.* v. *Elizarov*, No. 21-616, 2022 WL 18231680, at *1 n.14 (C.D. Cal. Dec. 12, 2022) (following *Foster* and dismissing claim that Unison concealed the nature of the transaction as being a loan because, "[w]hile [Plaintiff] refers to Unison's 'lending program,' the materials that Elizarov himself provides [which were the Option Agreement, Homebuyer Covenant Agreement, Homebuyer Security Instrument, and Homebuyer Recorded Memorandum similar to Plaintiff's here] make clear that the Option Agreement was not a loan"). That is also true here, under both the plain language of Plaintiff's

---

[18] Because the "UCCC conforms consumer credit regulation to the policies of the federal Truth in Lending Act," *Oasis*, 361 P.3d at 406, cases applying TILA are instructive.

agreement with Unison and Colorado law. The Option is "a unilateral contract" that "imposes no obligations upon" Unison unless and "until [it] elects to accept the offer contained in the option." *Shull*, 154 Colo. at 316; 2 Colo. Prac., Methods of Practice § 61:5; *see* Ex. 2-1 § 1.

The *Oasis* decision cited in the Complaint is consistent with this analysis. That opinion followed a state regulatory decision that the agreement at issue was a loan. 361 P.3d at 403–04. Under Oasis's agreement, it provided $1,234.00 to litigants at the outset of litigation that would be paid off when litigation proceeds became available in "specific sums" meeting the definition of debt articulated by the court. *Id.* at 402 & n.1. For example, within six months, the payoff amount was $1,851.00, within one year the payoff amount became $2,776.50, and in two years the payoff amount was $4,010.50. *Id.* Thus, unlike the Option here, the specific amount due increased over time in linear fashion akin to interest charges. The amount due was not dependent upon the amount of litigation proceeds eventually obtained (i.e., there was no persuasive argument that a percentage interest in the claim was purchased). As the Court explained, "[t]his growth in the repayment obligation over time is a finance charge and a hallmark of a consumer loan under the UCCC." *Id.* at 410. It is a hallmark that does not exist in the Option.

In sum, the court held that these arrangements were "loans" under Colorado's UCCC because they "create a debt, or an obligation to repay, that grows with the passage of time." *Id.* at 401. First, the court held that the litigation finance agreements "create debt because the plaintiffs receive a payment of money and, in exchange, they commit to fully compensate the finance companies from the future litigation proceeds." *Id.* at 407–08. This was true even though the debt was forgiven "[i]f the litigation proceeds are less than the amount due, [and] the plaintiffs are not required to repay the shortfall," because the "transactions create repayment obligations—debt—*at the outset*." *Id.* at 401, 408 (emphasis added). Again, not so with the Option, as explained above.

The loan characteristics identified in *Oasis* are not present here as there is no sum-certain amount calculated by contract terms that can be determined at the outset and the actual value of the option is determined by what the *Oasis* court termed "market conditions." *See id.* at 410. Depending on the market when a homeowner chooses to sell their home, Unison may receive a significant payment from the proceeds, a small payment (leaving it in a loss position), or nothing at all. *Supra* pp. 8–9. Indeed, Plaintiff alleges that this is one of the reasons she entered into the Option. *See* Compl. ¶ 72 (alleging the Debtor "understood that the market could increase or decrease" which "provided her with some comfort about the transaction").

In conclusion, the Option is an option, and options are legally distinct from loans, which are debt. The relevant case law—including precedent cited in the Complaint and opinions from federal district courts adjudicating a Unison Option—demonstrate that Unison's Option is an option and not a loan.

## IV. Plaintiff's Allegations of Fraudulent Notarization Do Not Void the Agreement.

In her sixth claim, Plaintiff requests "an order from the court determining that the Deed of Trust and Memorandum of Unison HomeOwner Agreement were not properly notarized, are not a validly executed document, and are of no force and effect." Compl. ¶ 172. Plaintiff's request for declaratory relief fails as a matter of law because even assuming, *arguendo*, that the documents "were not properly notarized," that would not impact their enforceability.

Plaintiff admits that she personally signed all of the Option documents, including the Deed of Trust and Memorandum of Unison HomeOwner Agreement. Compl. ¶ 92; *see also* Ex. 2-1 at 5; Ex. 2-2 at 35; Ex. 2-3 at 5; Ex. 2-4 at 10, 17 (reflecting Plaintiff's handwritten signatures). In Colorado, *that is all that is required*. "Colorado law does not require that a deed conveying property be notarized." *Burr v. Moyer*, No. 10-1503, 2012 WL 364072, at *5 (D. Colo. Feb. 2, 2012) (citing *Am. Nat'l Bank v. Silverthorn*, 287 P. 641, 642 (Colo. 1930)). Thus, as in *Burr*, it is

irrelevant whether the Deed of Trust and Memorandum were properly notarized, because they did not need to be notarized at all. *See Burr*, 2012 WL 364072, at *4 (holding deed was valid and enforceable "even though it lacked a notary's stamp"); *cf. Mbaku v. Bank of Am.*, No. 12-190, 2014 WL 4099313, at *12 (D. Colo. Aug. 20, 2014) (dismissing claim challenging validity of promissory note because under Colorado law "there is no requirement that an endorsement must be dated or notarized in order to be valid").

Courts have accordingly rejected similar requests to void conveyances of real property for "fraudulent notarization." For example, in *In re Armstrong*, the court denied a debtor's request to void Nationwide Mortgage's security interest in her home on the ground that, as Plaintiff alleges here, the recorded documents included a notary seal but "no notary was present at the July 30 closing at her home." 288 B.R. 404, 410 (Bankr. E.D. Pa. 2003); *see* Compl. ¶¶ 92–94,166–67. The court explained that the purpose of notarization "is to verify the executing party's identity and voluntary intention to be bound by the terms of the document." 288 B.R. at 430. Thus, while proper notarization is "conclusive," in the absence of a dispute as to the identity of the executing party, it is not necessary. *Id.* As a result, even if "no notary was present when the Debtor signed the mortgage," there was no "basis for avoiding the mortgage" absent evidence of "fraud or forgery with regard to [her] execution of the mortgage." *Id.* at 430–31; *see also In re Bell*, 309 B.R. 139, 159 (Bankr. E.D. Pa. 2004) ("the fact that [a mortgage] was not notarized in the Debtor's presence is not sufficient, on its own, to avoid the mortgage").

The same is true here. Plaintiff does not dispute that she personally and voluntarily executed the Deed of Trust and Memorandum of Unison Agreement. *See* Compl. ¶¶ 92, 167. Thus, even accepting her allegations as true, Plaintiff is not entitled to a declaration that these documents "void and of no force and effect," and her sixth claim should be dismissed.

## V. Plaintiff's Seventh Claim Should Be Dismissed Because She Fails to Allege an Adequate Basis for Rejection of the Option.

The seventh claim seeks a declaration that "the contracts at issue are executory contracts," Compl. ¶ 179, and "subject to rejection" under Section 365(a) of the Bankruptcy Code. *Id.* at 24 (Prayer for Relief). The Debtor also contradictorily pleads that she already "has rejected the contracts." *Id.* ¶ 179. [19] This claim should be dismissed on two grounds. First, the Option is not an executory contract because it does not require ongoing material performance from both parties. Second, even if the Court determined that the Option is an executory contract, rejection would not terminate the Option. The Debtor would be in default, but Unison, as a fully secured creditor, could not only still enforce the Option but also pursue all default remedies available under the documents. Thus, to the extent Claim 7 is treated as a motion under Bankruptcy Code Section 365 to reject the Option, rejection would not benefit the estate and the requested relief should be denied.

### A. The Option Is Not Executory.

Section 365(a) permits a debtor to "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Bankruptcy Code does not define "executory contract." *In re Baird*, 567 F.3d 1207, 1211 (10th Cir. 2009). However, the Tenth Circuit has adopted the widely-followed *Countryman* definition, under which a court assesses whether "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.*; *In re Banning Lewis Ranch Co., LLC*, 532 B.R. 335, 343 (Bankr. D. Colo. 2015).

---

[19] Although the Debtor's chapter 13 plan provides for rejection of all executory contracts, *see* Chapter 13 Plan § 6.4, *In re Deborah Dee Stone*, Case No. 24-12767-MER ("Bankr. Dkt."), No. 3 (May 21, 2024), confirmation of the plan is being held in abeyance pending resolution of this adversary proceeding. *See* Confirmation Status Report at 2, Bankr. Dkt. No. 16. Accordingly, no executory contracts have been rejected yet, and Unison therefore addresses the argument that the Option is executory and subject to rejection.

The Tenth Circuit has not addressed whether an option is executory. However, in *In re Robert L. Helms Constr. & Dev. Co., Inc.*, the Ninth Circuit held that an option is executory only if the option "*requires* further performance from each party at the time the petition is filed." 139 F.3d 702, 705 (9th Cir. 1998) (emphasis added). Like the typical option contract, the Option does not require performance by both parties and is therefore not executory. *Id.*; *supra* pp. 20–21; Ex. 2-1. Unison "need not exercise the option—if [it] does nothing, the option lapses without breach. The contingency which triggers potential obligations—exercising the option—is completely within the Debtor's control." *Id.* at 705–06; *supra* pp. 7–8. Thus, it is not an executory contract. *Id.*; *see also, e.g.*, *BNY Cap. Funding LLC v. US Airways, Inc.*, 345 B.R. 549, 554 (E.D. Va. 2006) (holding that an unexercised option is not an executory contract under the *Countryman* definition); *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 518 (Bankr. S.D.N.Y. 2024).

*In re Yang*, where a debtor sought to reject a Unison option, is particularly instructive. No. 23-75, 2023 WL 7104764 (Bankr. S.D. Ind. Oct. 23, 2023). Just like here, the debtor granted Unison an option and future right to purchase an interest in certain real property, which Unison could exercise upon the occurrence of certain events. The bankruptcy court held that the option contract was not executory because Unison's obligations "may or may not ever be due" since "performance is due only upon the exercise of the option[,]" and "if the option is not exercised, nothing happens and neither party commits a breach." *Id.* at *1–2 (quoting *Helms*, 139 F.3d at 705).

In this case, like *Yang*, there is no further performance *required* by Unison under the Option, and absent an exercise of the Option, there could be no breach of contract. The Debtor attempts to distinguish *Yang* by alleging that the Unison has future obligations because it will need to pay an additional $105,000 "at such time as [the Debtor] sells the home or the agreement terminates."

Compl. ¶ 177. But that payment obligation is contingent upon a sale and option exercise which might never occur, and therefore there is no required performance by Unison. *See Baird*, 567 F.3d at 1211. Plaintiff also alleges that Unison "retain[s] future obligations to determine whether to exercise their option and take relevant steps related to the exercise or termination of their option, including providing [the Debtor] notice of what it decides about exercising its option." Compl. ¶ 178. To the extent considering whether to exercise its option and notifying the Debtor of its decision constitute "obligations" of Unison, however, they are "best considered ministerial," and failure to fulfill them would not be a breach of the parties' agreement. *Baird*, 567 F.3d at 1212.

Because no non-contingent, unperformed, material obligations under the Option exist, the Option is not an executory contract and the seventh claim must be dismissed.

**B. Unison's Interest Is Secured so Rejection Would Violate the Business Judgment Rule and Serve No Useful Purpose.**

Even if the Court were to determine that that the Option is an executory contract—and it has no basis to do so—and treat the Complaint as a motion to approve the rejection of an executory contract, the relief should be denied because rejection would not benefit the Debtor's estate. *In re Tilco, Inc.*, 558 F.2d 1369, 1373 (10th Cir. 1977); *see In re Sundial Asphalt Co., Inc.*, 147 B.R. 72, 81 (E.D.N.Y. 1992) (debtor must "demonstrate that rejection will benefit the estate").

If the Court were to authorize rejection of the Option, the Debtor would be deemed in breach. "[R]ejection of a contract does not work a rescission of the contract and is not, itself, an avoiding power." *In re Banning Lewis Ranch*, 532 B.R. at 345. Rather, rejection is merely a breach of contract and permits the counterparty to file a claim for breach. *Id.* Thus, "all the rights that would ordinarily survive a contract breach . . . remain in place," *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 372 (2019), and "[t]he extent to which a claim is secured is wholly unaffected" by rejection. *Leasing Serv. Corp. v. First Tenn. Bank Nat'l Ass'n*, 826 F.2d 434, 437

(6th Cir. 1987). Upon rejection, Unison, a secured creditor, *see* Compl. ¶¶ 2, 65, 102, 117, 130, 141, 153, would have a secured breach of contract claim that it could immediately assert. *See* Ex. 2-2 §§ 7.1–7.6; Bankr. Dkt. No. 16-1 at 25–30 (specifying remedies available to Unison upon a default, including money damages and specific performance). Rejection would thus *improve* Unison's position and give it greater rights than exist absent a breach. Given the lack of any benefit to the estate, the requested relief would not constitute a reasonable exercise of business judgment and should be denied. *See In re Brick House Props., LLC*, 633 B.R. 410, 426 (Bankr. D. Utah 2021) (business judgment test not satisfied where estate would not benefit from rejection).[20]

## VI. Plaintiff's Eighth Claim Should Be Dismissed Because Unison's Proof of Claim Adequately Asserts a Basis for Recovery.

The final claim seeks disallowance of Unison's proof of claim. Disallowance is governed by Section 502(b) of the Bankruptcy Code, which identifies categories of claims that are subject to disallowance. Though not expressly pled in the Complaint, because the Debtor alleges the Option contracts are "void and invalid," Compl. ¶ 187, she presumably seeks disallowance under Section 502(b)(1), which authorizes a court to disallow a claim that "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1147 (10th Cir. 2015) (quoting 11 U.S.C. § 502(b)(1)). Under this provision, "disallowance of a claim is appropriate 'when the claimant has no rights vis-à-vis the bankrupt, i.e., when there is 'no basis in fact or law' for any recovery from the debtor.'" *Id.* at 1148 (cleaned up).

[20] For substantially similar reasons, the claim should be dismissed because it would neither "settle the controversy" nor "serve a useful purpose," as required for declaratory relief. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994); *see In re Banning Lewis Ranch*, 532 B.R. at 346.

Plaintiff makes three general allegations in support of her claim: (1) "[n]one of the contracts bear Unison's signature," Compl. ¶ 185; (2) "[t]he assignment predates [Plaintiff's] signature on any of the contracts," *id.* ¶ 186; and (3) the proof of claim "contradictorily" lists the amount due as $0.00 and $88,352.60, *id.* ¶¶ 182–83. These allegations, taken together or alone, do not form a basis for claim disallowance.

First, the validity of the assignment does not affect the validity of the proof of claim. At most, Plaintiff alleges facts that would provide a basis to find the assignment from "Unison Agreement Corp." to "Odin New Horizon Real Estate Fund LP" was not effective. Compl. ¶¶ 83–85, 186. But here, the proof of claim was filed on behalf of both entities. *See* Bankr. Dkt. No. 16-1 at 1. The Debtor's allegations, if true, would only establish that UAC, rather than Odin, holds the Option. They would not prove there is "no basis in fact or law for any recovery from the debtor," as required for claim disallowance under section 502(b)(1). *Alternate Fuels*, 789 F.3d at 1148.

Second, the absence of a Unison signature on the contracts does not provide a basis for disallowance. Under Colorado law, only the signature of the "vendor"—*i.e.*, the Debtor, the seller—is necessary to form a valid contract. *Karakehian*, 915 P.2d at 1298 (Colorado statute of frauds "requires that contracts for an interest in land be evidenced by a memorandum signed by the party by whom the sale is to be made, in other words, the vendor"); *Corum Real Est. Grp., Inc. v. Blackrock Realty Advisors, Inc.*, No. 09-1680, 2010 WL 1957226, at *7 (D. Colo. May 14, 2010) (same, citing *Karakehian*). The Debtor's signature on the documents reflects her acceptance of the contract terms, and that is all that is required.

Third, there is no ambiguity about Unison's claim. The proof of claim indicates it is secured by real property and refers to Attachment A. Bankr. Dkt. No. 16-1 at 2. Attachment A, in turn,

explains that "the amount owed under the claim is not fixed until such time as the Property is sold or otherwise disposed of," —*i.e.* that the amount of the claim is unliquidated, attaches all of the operative grants and other documents, and includes an estimate of the amount due as of the petition date: $88,352.60. *Id.* at 4. Plaintiff's allegations regarding the claim amount fall far short of proving there is "no basis in fact or law" for claim allowance. *Alternate Fuels*, 789 F.3d at 1148.[21]

Even if the Court were to conclude that the claim as filed is infirm or ambiguous, the proper course would be to grant Unison leave to amend. "Ordinarily, amendment of a proof of claim is freely permitted so long as the claim initially provided adequate notice of the existence, nature, and amount of the claim as well as the creditor's intent to hold the estate liable." *In re Unioil, Inc.*, 962 F.2d 988, 992 (10th Cir. 1992) (allowing amendment because the original creditor assigned his interest to a trust before the proof of claim was filed); *accord In re Richter*, 478 B.R. 30, 39 (Bankr. D. Colo. 2012); *see also In re Hemingway Transp., Inc.*, 954 F.2d 1, 10 (1st Cir. 1992).

Unison satisfies the criteria for amendment because its filed proof of claim provided adequate notice of the existence, nature, and amount of Unison's claim and its intent to hold the Debtor liable. *See Unioil*, 962 F.2d at 992. An amended proof of claim would simply clarify any issues identified by the Debtor. It would not create a "distinctly new" right to payment, would not prejudice other creditors, and would not be the product of bad faith or dilatory tactics. *Hemingway Transp.*, 954 F.2d at 10. Thus, if the Court finds that the Debtor has adequately alleged a fatal

[21] Disallowance would be particularly inappropriate here given that Unison's Option interests are fully secured, *see* Compl. ¶¶ 2, 65, 102, 117, 130, 141, 153, and thus it was not required to file a proof of claim at all. Because "liens pass through bankruptcy unaffected," in "many circumstances, a secured creditor may ignore the proof of claim process altogether and look solely to its lien for satisfaction of the debt." *In re Gordon*, 471 B.R. 614, 620 (D. Colo. 2012) (internal citation and quotation marks omitted); *see also* Fed. R. Bankr. P. 3002(a) ("A lien that secures a claim against the debtor is not void due only to the failure of any entity to file a proof of claim."); *In re Rome*, 162 B.R. 872, 876 (Bankr. D. Colo. 1993) ("secured creditors need not file proofs of claim in order to receive payment on their secured claims" in a chapter 13 case).

infirmity in the proof of claim, the appropriate remedy would be to grant Unison leave to file an amended claim—not to disallow its claim.

## CONCLUSION

For the foregoing reasons, Unison respectfully requests that the Court dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated: October 24, 2024

Respectfully submitted,

MARKUS WILLIAMS YOUNG &
HUNSICKER LLC

By: */s/ Lacey S. Bryan*
James Markus (CO #25065)
Lacey S. Bryan (CO #51908)
1775 Sherman Street, Suite 1950
Denver, Colorado 80203-4505
Telephone (303) 830-0800
Facsimile (303) 830-0809
jmarkus@markuswilliams.com
lbryan@markuswilliams.com

JENNER & BLOCK LLP

By: */s/ Jeremy M. Creelan*
Jeremy M. Creelan (NY #2831535)
1155 Avenue of the Americas
New York, New York 10036-2711
Telephone (212) 891-1600
jcreelan@jenner.com

*Counsel for Real Estate Equity Exchange, Inc., Unison Agreement Corp., Odin New Horizon Real Estate Fund LP, and Unison Investment Management, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 24, 2024 pursuant to L.B.R. 9013-1 and 9036-1 a copy of the foregoing **MOTION TO DISMISS ADVERSARY COMPLAINT** was electronically filed and served via e-mail on the following:

**Via CM/ECF**

Shennan Kavanagh
skavanagh@nclc.org

Alex Witteveld
awitteveld@colegalserv.org

Dated: October 24, 2024

*/s/ Jessica Anderson*
Markus Williams Young & Hunsicker LLC
1775 Sherman Street, Suite 1950
Denver, CO 80203
Telephone: 303-830-0800